[No. S059170. Apr. 6, 1998.]

In re the Marriage of GILBERT A. and GLADYS J. WALRATH.
GILBERT A. WALRATH, Appellant, v.
GLADYS J. WALRATH, Respondent.

**COUNSEL**

Don A. Anderson, Katzoff & Riggs and Robert R. Riggs for Appellant.

Brigham & Gaustad and G. Scott Gaustad for Respondent.

**OPINION**

**BROWN, J.**—In the absence of a written waiver, a spouse who contributes separate property to a community property acquisition is reimbursed upon

dissolution of the marriage. (Fam. Code,[1] § 2640, subd. (b).) The issue in this case is whether a spouse's reimbursement right for a separate property contribution to a community property acquisition carries through to other community property subsequently acquired with proceeds from the original acquisition. The Court of Appeal held it does not. The court concluded that the right to reimbursement only attaches to the specific community property to which the separate property contribution was originally made. We disagree, and therefore reverse its judgment.

## I. Facts and Procedural Background

The relevant facts are undisputed. Gilbert A. and Gladys J. Walrath (Gilbert and Gladys) were married on January 11, 1992, and separated less than three years later. This dissolution action followed. During their brief marriage, Gilbert and Gladys engaged in numerous real estate transactions. We address only those forming the basis of the reimbursement claim.

Prior to the marriage, Gilbert owned a house in Lucerne, California. In June of 1992, Gilbert deeded the property to himself and Gladys as joint tenants. The property then had a market value of $228,000, an $82,000 mortgage, and equity of $146,000. Gladys later contributed $20,000 from her separate property to reduce the mortgage principal.

In 1993, the Lucerne property had a market value of $240,000. The couple refinanced the home, borrowing $180,000 against their equity interest. At trial, the parties stipulated that they used approximately $60,000 of the loan proceeds to pay down the existing loan on the Lucerne property, another $62,000 to pay off the mortgage on a property in Nevada, and an additional $40,500 to acquire and improve a property in Utah. They placed $16,000 in a joint savings account. The record is silent on the remaining $1,500 of the loan proceeds.

The parties agree that once the Lucerne property was deeded to Gilbert and Gladys as joint tenants in June 1992, it was community property. The parties also agree that the subsequently obtained loan proceeds, the Nevada and Utah properties, and the joint bank account were likewise community property.

The trial court ruled Gilbert and Gladys were each entitled to reimbursement on a proportionate basis, assessed at 88 percent and 12 percent respectively, for their contributions to the Lucerne property. The court limited reimbursement, however, to the amount of equity in the Lucerne

---

[1] All statutory references are to the Family Code unless otherwise indicated.

property at the time of division. Based on a reduced market value of $175,000 and an indebtedness of $174,000, the equity was only $1,000. The court consequently ordered reimbursement of $880 to Gilbert and $120 to Gladys.

In his request for a statement of decision, Gilbert asserted he was also entitled to reimbursement from the Nevada and Utah properties because funds from the Lucerne property refinance were used to acquire, pay down the indebtedness of, and/or improve these assets. In its statement of decision, the trial court found that approximately $60,000 of the loan proceeds was used to pay an existing encumbrance on the Lucerne property, $62,185 to pay off the mortgage on the Nevada property, and $37,500 as a downpayment on the Utah property. It concluded that "there is no reimbursable claim pursuant to Family Code section 2640 for the loan proceeds traced into the" Nevada and Utah properties.[2]

The Court of Appeal affirmed. We granted Gilbert's petition for review.

## II. Discussion

Section 2640,[3] subdivision (b), provides, "In the division of the community estate under this division, unless a party has made a written waiver of the right to reimbursement or has signed a writing that has the effect of a waiver, the party shall be reimbursed for the party's contributions to the acquisition of the property to the extent the party traces the contributions to a separate property source. The amount reimbursed shall be without interest or adjustment for change in monetary values and shall not exceed the net value of the property at the time of the division." Section 2640, subdivision (a), provides, " 'Contributions to the acquisition of the property,' as used in this section, include downpayments, payments for improvements, and payments that reduce the principal of a loan used to finance the purchase or

---

[2]As can be seen, there are inconsistencies between the parties' trial stipulation and the statement of decision. For example, in the stipulation, the parties stated that $16,000 of the loan proceeds could be traced to a bank account; no such statement appears in the statement of decision. In addition, in the stipulation, the parties stated that $40,500 of the loan proceeds was spent acquiring and improving the Utah property. The statement of decision, however, states that $37,500 of the loan proceeds was spent as a downpayment on the Utah property. Neither party objected to the statement of decision. The Court of Appeal relied on the parties' stipulation. No petition for rehearing was filed. Because here we only determine whether tracing to subsequently acquired assets is permitted under section 2640, we do not resolve these anomalies, but leave the issue for resolution by the parties on remand.

[3]Section 2640 was originally enacted in 1983 as Civil Code section 4800.2. It was recodified without substantive change as section 2640 when the Family Code was created in 1992. (See Cal. Law Revision Com. com., 29D West's Ann. Fam. Code (1994 ed.) foll. § 2640, p. 136.)

improvement of the property but do not include payments of interest on the loan or payments made for maintenance, insurance, or taxation of the property."

Under section 2640, the separate property contribution is reimbursed *prior* to the division of community property. (*In re Marriage of Witt* (1987) 197 Cal.App.3d 103, 105, 108-109 [242 Cal.Rptr. 646]; *In re Marriage of Tallman* (1994) 22 Cal.App.4th 1697, 1698-1700 [28 Cal.Rptr.2d 323]; Hogoboom & King, Cal. Practice Guide: Family Law 2 (The Rutter Group 1997) ¶ 8:466, p. 8-118.1 ["A reimbursement award comes off the top of the community property item in question before the [community property] interest in that property is divided." (Italics omitted.)].) If there is insufficient equity at the time of dissolution in the property to which the contribution was made to fully reimburse the contribution, the entire asset is awarded to the contributing spouse. (*In re Marriage of Witt, supra*, 197 Cal.App.3d at pp. 105, 108-109.)

The question here is whether a party's entitlement to a separate property contribution reimbursement is limited to the original community property to which the contribution was made, or whether, when that original property is refinanced, and the proceeds used in part to purchase or pay down the indebtedness on the original and other assets, the contributing spouse can trace the contribution to, and be reimbursed from, those assets other than the original asset. The answer to this question turns on the meaning of the phrase "the property" in section 2640.

A.   *Background of Section 2640*

In *In re Marriage of Lucas* (1980) 27 Cal.3d 808 [166 Cal.Rptr. 853, 614 P.2d 285], Brenda and Gerald, a married couple, purchased a home for $23,300, taking title as joint tenants. (*Id.* at p. 811.) Brenda used $6,351.57 from her separate property as a downpayment on the home. (*Ibid.*) Brenda subsequently paid $2,962 from her separate property to improve the property. (*Ibid.*) At the time of dissolution, the residence had a fair market value of approximately $56,250, and the equity in the home was approximately $41,650.

We first held that because of the form of title, the home was presumed to be community property absent an oral or written agreement to the contrary that Brenda could demonstrate on remand. (*In re Marriage of Lucas, supra*, 27 Cal.3d at p. 815.) We then addressed the reimbursement Brenda would be entitled to should the property be found to be community property. We stated, "If on reconsideration the house is found to be entirely community in

nature, Brenda would also be barred from reimbursement for the separate property funds she contributed in the absence of an agreement therefor. It is a well-settled rule that a 'party who uses his separate property for community purposes is entitled to reimbursement from the community or separate property of the other only if there is an agreement between the parties to that effect.' " (*Id.* at p. 816, quoting *See* v. *See* (1966) 64 Cal.2d 778, 785 [51 Cal.Rptr. 888, 415 P.2d 776].) "While the parties are married and living together it is presumed that, 'unless an agreement between the parties specifies that the contributing party be reimbursed, a party who utilizes his separate property for community purposes intends a gift to the community.' " (*In re Marriage of Lucas, supra,* 27 Cal.3d at p. 816, quoting *In re Marriage of Epstein* (1979) 24 Cal.3d 76, 82 [154 Cal.Rptr. 413, 592 P.2d 1165].)

In 1983, the Legislature passed Assembly Bill No. 26 (1983-1984 Reg. Sess.). This bill added former Civil Code sections 4800.1 and 4800.2, now Family Code sections 2581[4] and 2640. (Added by Stats. 1983, ch. 342, §§ 1, 2, p. 1538.) The legislative history of Assembly Bill No. 26 expressly states that former Civil Code section 4800.2 was enacted to "reverse[] the rule of *In re Marriage of Lucas*, 27 Cal.3d 808 [citation] (1980), and cases following it, which precluded recognition of the separate property contribution of one of the parties to the acquisition of community property, unless the party could show an agreement between the spouses to the effect that the contribution was not intended to be a gift." (Cal. Law Revision Com. com., 29D West's Ann. Fam. Code, *supra,* foll. § 2640, p. 136.) "Under case law, absent an agreement to the contrary, a spouse who contributes separate property funds to the acquisition of community property relinquishes any separate property claim. A gift is presumed, and this presumption may be overcome only by evidence of oral agreements or conduct to the contrary. *In re Marriage of Lucas,* (1980) 27 Cal.3d 808. Thus the contributing party is precluded from tracing and recovering the separate funds at dissolution. [¶] This bill would overturn the *Lucas* interpretation by permitting a party, absent a written waiver of the reimbursement right, to recover [at dissolution] separate property contributions to the acquisition of the community property." (Sen. Com. on Judiciary, analysis of Assem. Bill No. 26 (1983-1984 Reg. Sess.) as amended June 20, 1983, p. 6.)

---

[4]Section 2581 provides: "For the purpose of division of property on dissolution of marriage or legal separation of the parties, property acquired by the parties during marriage in joint form, including property held in tenancy in common, joint tenancy, or tenancy by the entirety, or as community property, is presumed to be community property. This presumption is a presumption affecting the burden of proof and may be rebutted by either of the following: [¶] (a) A clear statement in the deed or other documentary evidence of title by which the property is acquired that the property is separate property and not community property. [¶] (b) Proof that the parties have made a written agreement that the property is separate property."

"The separate property contribution is measured by the value of the contribution at the time the contribution is made. Under this rule, if the property has since appreciated in value, the community is entitled to the appreciation. If the property has since depreciated in value, reimbursement may not exceed the value of the property; if both parties are entitled to reimbursement and the property has insufficient value to permit full reimbursement of both, reimbursement should be on a proportionate basis." (3 Sen. J. (1983-1984 Reg. Sess.) pp. 4866-4867.) "AB 26 would avoid the inequity that may result in a case where property taken in joint tenancy form is divided equally between the spouses despite a showing that one spouse contributed a substantial portion of separate funds to the acquisition." (Assem. Com. on Judiciary, analysis of Assem. Bill No. 26 (1983-1984 Reg. Sess.) as amended Apr. 4, 1983, p. 4.)

Assembly Bill No. 26 expressly stated that its provisions applied to "(a) Proceedings commenced on or after January 1, 1984. [¶] (b) Proceedings commenced before January 1, 1984, to the extent proceedings as to the division of the property are not yet final on January 1, 1984." (Stats. 1983, ch. 342, § 4, p. 1539.) In a series of cases following the passage of Assembly Bill No. 26, we concluded that retroactive application of former Civil Code sections 4800.1 and 4800.2 was unconstitutional because it would impair vested property rights in violation of the due process clause. (See *In re Marriage of Buol* (1985) 39 Cal.3d 751, 763-764 [218 Cal.Rptr. 31, 705 P.2d 354]; *In re Marriage of Fabian* (1986) 41 Cal.3d 440, 448-451 [224 Cal.Rptr. 333, 715 P.2d 253]; *In re Marriage of Heikes* (1995) 10 Cal.4th 1211, 1223-1225 [44 Cal.Rptr.2d 155, 899 P.2d 1349].)

In *In re Marriage of Buol, supra*, 39 Cal.3d 751, Esther Buol, while married to Robert, purchased a home in 1963. (*Id.* at pp. 754-755.) The original purchase price of the home was $17,500; at the time of dissolution, it was valued at approximately $167,500. (*Id.* at p. 755.) While title was taken in joint tenancy, there was evidence that Robert had emphasized numerous times that Esther's earnings were hers, and that "he had always maintained that the house was hers and that he wanted no responsibility for it." (*Ibid.*) Robert contributed nothing to the mortgage, taxes, insurance, or maintenance. (*Ibid.*) The trial court found that the parties had an enforceable oral agreement, and entered judgment awarding the home to Esther. (*Ibid.*)

While the appeal was pending, former Civil Code section 4800.1 was enacted. (*In re Marriage of Buol, supra*, 39 Cal.3d at p. 755.) This section provided, and in its present form as section 2581 continues to provide, that property held in joint tenancy form is presumed to be community property. This presumption may only be rebutted by " '(a) A clear statement in the

deed or other documentary evidence of title by which the property is acquired that the property is separate property and not community property. [¶] (b) Proof that the parties have made a written agreement that the property is separate property.' " (39 Cal.3d at p. 755, fn. 4.)

We concluded that the Legislature intended the statute to be applied retroactively. (*In re Marriage of Buol, supra*, 39 Cal.3d at p. 756.) However, we further concluded that "[r]etroactive application of section 4800.1 would operate to deprive Esther of a vested property right without due process of law. [Citation.] At the time of trial, Esther had a vested property interest in the residence as her separate property. . . . [¶] . . . [¶] At all relevant times—when Esther purchased the home, during trial and when the trial court entered judgment for Esther—proof of an oral agreement was all that was required to protect Esther's vested separate property interest. [Citation.] Section 4800.1's requirement of a writing evidencing the parties' intent to maintain the joint tenancy asset as separate property operates to substantially impair that interest." (39 Cal.3d at p. 757, fn. omitted.) We further concluded that unlike other marital property division statutes whose retroactive application had been found to be constitutional, "[s]ection 4800.1 cures no 'rank injustice' in the law and, in the retroactivity context, only minimally serves the state interest in equitable division of marital property, at tremendous cost to the separate property owner." (*Id.* at p. 761.)

In *In re Marriage of Fabian, supra*, 41 Cal.3d 440, we similarly concluded retroactive application of former Civil Code section 4800.2, now section 2640, the statute at issue here, also "impaired vested property rights without due process of law." (41 Cal.3d at p. 443.) We observed, "[f]or more than 20 years prior to the enactment of section 4800.2, it was well-established that, absent an agreement to the contrary, separate property contributions to a community asset were deemed gifts to the community." (*Id.* at p. 446.) We also concluded that the implicit legislative judgment "that it would be fairer to the contributing party to allow separate property reimbursement upon dissolution" did not represent a "sufficiently significant state interest to mandate retroactivity." (*Id.* at p. 449.) "Prior to adoption of section 4800.2's right to reimbursement, the spouse contributing separate property to the acquisition of a community asset could readily preserve the separate property character of the contribution by agreement, either written or oral, with the other spouse. Absent such an understanding, it could reasonably be assumed that by investing in a community asset, the contributing spouse intended to bestow a permanent benefit on the community. In leaving the agreement option open to the contributing spouse, prior law was not inherently inequitable or unfair." (*Ibid.*)

The Legislature promptly reacted to this court's pronouncements in *Buol* and *Fabian*. (*In re Marriage of Heikes, supra*, 10 Cal.4th at p. 1219.) "In

April 1986, within a month after the filing of *Fabian*, the Governor signed urgency legislation declaring that sections 4800.1 and 4800.2 'appl[y] to proceedings commenced on or after January 1, 1984, regardless of the date of acquisition of property subject to the proceedings or the date of any agreement affecting the property' (Stats. 1986, ch. 49, § 1, p. 115 . . .). The urgency statute explained that sections 4800.1 and 4800.2, as enacted in 1983, had been made applicable 'immediately to all family law proceedings not yet final on January 1, 1984, [their] effective date, in order to cure a serious problem in the law governing division of assets at dissolution of marriage . . . . [¶] The Buol decision [citation] has caused confusion among family law judges and lawyers as to what law governs in a heavily litigated area in which important property rights are affected. The decision also frustrates the intent of the Legislature to correct a serious problem in the law that is causing inequitable treatment of many parties. [¶] This act is intended to resolve the confusion created by Buol and to reaffirm the need for immediately applicable legislation, to the extent constitutionally permissible, in order to assure all litigants of equitable treatment upon dissolution of marriage.' " (*In re Marriage of Heikes, supra*, 10 Cal.4th at p. 1220, fn. and italics omitted.)

"Two Court of Appeal decisions soon thereafter held that the urgency statute's mandate to apply the reimbursement requirement of section 4800.2 to community property acquired before January 1, 1984, was unconstitutional." (*In re Marriage of Heikes, supra*, 10 Cal.4th at p. 1220.) "Meanwhile, the Legislature amended section 4800.1, as of January 1, 1987, by adding a new subdivision (a), codifying expanded recitals of 'a compelling state interest . . . to provide for uniform treatment of property' and providing that, regardless of the date of the property's acquisition, or of any agreement affecting title, sections 4800.1 and 4800.2 were 'applicable in all proceedings commenced on or after January 1, 1984,' except 'property settlement agreements executed prior to January 1, 1987, or proceedings in which judgments were rendered prior to January 1, 1987' (§ 4800.1, subd. (a)(3))." (*In re Marriage of Heikes, supra*, 10 Cal.4th at p. 1221, fn. omitted.) In *Heikes*, we concluded that the legislative declarations in the urgency statute and in the statute adding subdivision (a) to former Civil Code section 4800.1 "do not manifest state interests any more compelling than the interests *Fabian* found insufficient to justify retroactive impairment of a vested right." (10 Cal.4th at p. 1223.)

B. *Analysis*

We begin with the language of the statute. The relevant phrase in section 2640, "the property," is ambiguous. On the one hand it could mean, as

Gladys asserts, and as the Court of Appeal held, only the specific community property to which the separate property contribution is originally made. On the other hand it could mean, as Gilbert asserts, not only this specific community property, but also any subsequently acquired property to which the contribution can be traced. ▮ " 'We must select the construction that comports most·closely with the apparent intent of the Legislature, with a view to promoting rather than defeating the general purpose of the statute, and avoid an interpretation that would lead to absurd consequences.' " (*Mercy Hospital & Medical Center* v. *Farmers Ins. Group of Companies* (1997) 15 Cal.4th 213, 219 [61 Cal.Rptr.2d 638, 932 P.2d 210].)

▮ We conclude that the phrase "the property" in section 2640 includes not only the specific community property to which the separate property was originally contributed, but also any other community property that is subsequently acquired from the proceeds of the initial property, and to which the separate property contribution can be traced. Nothing in the language of the statute precludes this result. Indeed, it is apparent that in providing for reimbursement "to the extent the party traces the contributions to a separate property source," section 2640 envisions some tracing. More significantly, the only exceptions to the statutory reimbursement right are a signed written waiver or a signed writing that has the effect of a waiver. (§ 2640, subd. (b); *In re Marriage of Fabian, supra*, 41 Cal.3d at p. 450 [Under former Civil Code section 4800.2, "the separate property interest is now preserved unless the right to reimbursement is waived in writing." (Italics omitted.)].) Gladys does not assert that any such waiver is present in this case.

The effect of section 2640 was "to overturn a long line of cases which had held that absent an agreement to the contrary, separate property contributions to the community were deemed to be gifts to the community." (*In re Marriage of Perkal* (1988) 203 Cal.App.3d 1198, 1201 [250 Cal.Rptr. 296]; see *In re Marriage of Fabian, supra*, 41 Cal.3d at pp. 449-450 [Legislative history of former Civil Code section 4800.2 reveals a "legislative judgment that it would be fairer to the contributing party to allow separate property reimbursement upon dissolution."].) Indeed, the importance of this reimbursement right to the Legislature is apparent by that body's express response to *In re Marriage of Lucas*, and its repeated attempts to make the statute constitutionally retroactive. Therefore, it seems unlikely that the Legislature intended a contributing spouse would lose the right to reimbursement merely because the specific property to which the money was contributed was· refinanced. Rather, the right to reimbursement should follow the assets to which the contribution can be traced.

Moreover, in *Buol*, *Fabian*, and *Heikes*, we referred to the property rights held by a spouse under the pre-1984 law as "vested." (*In re Marriage of*

*Buol, supra,* 39 Cal.3d at p. 763; *In re Marriage of Fabian, supra,* 41 Cal.3d at p. 451; *In re Marriage of Heikes, supra,* 10 Cal.4th at p. 1225.) By this, we meant that they were " 'not subject to a condition precedent.' " (*In re Marriage of Buol, supra,* 39 Cal.3d at p. 757, fn. 6.) Under similar reasoning, a contributing spouse has a vested property right in his or her right to reimbursement for separate property contributions to community property under the post-1984 law, or section 2640. (*In re Marriage of Perkal, supra,* 203 Cal.App.3d at p. 1202 [husband has a property right to seek reimbursement of separate property contribution]; *In re Marriage of Witt, supra,* 197 Cal.App.3d at p. 107 [former Civil Code section 4800.2 "creates a substantive right of reimbursement" and "a new property right in the contributing spouse"].) It would be incongruous to hold such a significant property interest exists only in the original property to which the separate property contribution is made.

Finally, interpreting section 2640 to allow tracing to subsequently acquired assets is supported by important policy considerations. It encourages married persons to freely and without reservation contribute their separate property assets to benefit the community, and alleviates the need for spouses to negotiate with each other during marriage regarding continuing reimbursement rights. Under this interpretation, section 2640 protects the general expectations of most people in marriage, i.e., that spouses will be reimbursed for significant monetary contributions to the community should the community dissolve.

Here, Gilbert contributed $146,000. It is clear (not considering Gladys's separate property contribution) that had the property not been refinanced, upon dissolution of the marriage .Gilbert would have been entitled under section 2640 to reimbursement of this amount to the extent that the property's equity was still at least $146,000. As Gilbert notes, "[i]nstead of promoting the basic legislative goal of securing reimbursement in the event of dissolution to a spouse who has contributed separate property to the community, the Court of Appeal's construction results in a fortuitous difference in the treatment of spouses who have retained the same separate property assets originally contributed as opposed to spouses who have converted the contributed property into other assets." Nothing in the language of section 2640 or its legislative history suggests an intent to create such an arbitrary distinction.

Indeed, the parties have stipulated the loan proceeds can be traced to particular assets. Thus, these assets were acquired in significant part because of Gilbert's separate property contribution. To preclude any tracing of the loan proceeds would result in manifest unfairness. The parties were married

less than three years. Gilbert contributed $146,000, but under the narrow reading by the Court of Appeal would recover only the dramatically lower amount of $880.

Gladys asserts that because "only community funds, and no separate funds, were used to purchase the new community assets, there is no right of reimbursement from those assets." Of course, a reimbursement right under section 2640 only arises once the property becomes community property. Section 2640, subdivision (b), provides for reimbursement during "the division of the community estate." (See *In re Marriage of Schoettgen* (1986) 183 Cal.App.3d 1, 9 [227 Cal.Rptr. 758] ["Because we affirm the community property finding, the question arises whether Husband is entitled to reimbursement pursuant to Civil Code section 4800.2."].) Moreover, assuming that there is no right of reimbursement because the property was acquired with community funds begs the question before us of whether under section 2640 a spouse can trace the separate property contribution to subsequently acquired assets.

Gladys also asserts that allowing reimbursement from community property "to which no separate property contribution has been made" is inconsistent with the language of section 2640, subdivision (b), which provides that "[t]he amount reimbursed . . . shall not exceed the net value of the property at the time of the division." However, when a separate property contribution can be traced to other community assets, then these assets are by definition "property" to which a separate property contribution has been made. Thus, the phrase "the property" would include all such properties. Accordingly, here the "net value of the property" would be the net value not only of the Lucerne property, but also of the other assets on which the loan proceeds were spent, subject to the tracing formula set forth below. (See *post*, pp. 921-924.)

Both parties rely on *In re Marriage of Neal* (1984) 153 Cal.App.3d 117 [200 Cal.Rptr. 341], disapproved in *In re Marriage of Buol, supra*, 39 Cal.3d at pages 758, footnote 8, 763, footnote 10 and *In re Marriage of Fabian, supra*, 41 Cal.3d at page 451, footnote 13. *Neal*, however, is of no assistance in resolving the issues at hand because it did not involve the tracing of a separate property contribution through subsequently acquired assets. Rather, it involved the putative wife's separate property contribution of certain loan proceeds to a home that was quasi-marital property. (*In re Marriage of Neal, supra*, 153 Cal.App.3d at pp. 121, 125.)[5]

---

[5]Here, the parties agree that their respective contributions were from separate property sources, and on the amount of those contributions. The question is whether Gilbert's separate

## C. *Tracing Method*

■ Having concluded that Gilbert is entitled to reimbursement of his separate property contribution from those assets to which the contribution may be traced, we now delineate the method by which such tracing is performed.

Nothing in the record states the Lucerne property equity at the time of refinancing. We know only that the market value was $240,000. For purposes of explaining how tracing would be accomplished, we estimate that the equity was approximately $180,000,[6] and that these proceeds were then spent as stated in the stipulation: $60,000 to pay down the loan on the Lucerne property, $40,500 to acquire and improve the Utah property, $62,000 to pay off the indebtedness on the Nevada property, and $16,000 deposited in a joint bank account. At trial, the Lucerne property had an equity of $1,000, the Utah property had an equity of $74,500, the Nevada property had an equity of $125,000 (subject to an undisputed prior separate property contribution of $63,000 by Gilbert), and the $16,000 in the bank account had been withdrawn by Gilbert but was available in a different account.

As noted above, prior to the refinancing of the Lucerne property, Gilbert made a separate property contribution of $146,000, and Gladys $20,000, for a total of $166,000. Assuming an equity of $180,000, the $180,000 loan proceeds necessarily included both Gilbert's and Gladys's separate property contributions, as well as $14,000 of community interest.

property contribution can be traced to subsequently acquired assets. If the original asset is not sold or refinanced, there is little "tracing" involved; the contributing spouse gets his or her reimbursement prior to the division of any community property. (*In re Marriage of Tallman, supra,* 22 Cal.App.4th at pp. 1698-1700; *In re Marriage of Witt, supra,* 197 Cal.App.3d at pp. 105, 108-109.) Neither the "direct" nor "family expense" tracing method is necessary. (See generally, *In re Marriage of Mix* (1975) 14 Cal.3d 604, 612 [122 Cal.Rptr. 79, 536 P.2d 479].) If, however, the original property to which the contribution is made is refinanced, the "tracing" that is involved is ascertaining what portion of the amount contributed was transferred to the new asset or remains in the original asset. Accordingly, different tracing methods are appropriate in this context than are used when trying to characterize separate and community interests in, for example, a commingled bank account.

We recognize, however, that in ascertaining whether a party's contribution was *derived* from a separate property source, use of the direct and family expense tracing methods may be appropriate. (See *In re Marriage of Braud* (1996) 45 Cal.App.4th 797, 822-825 [53 Cal.Rptr.2d 179] [husband's claim for reimbursement under section 2640 fails in part because husband unable to adduce sufficient evidence that $10,000 contribution was separate property under either the direct or family expense methods].) We need not decide the issue in this case because the parties agree on the existence and amount of their separate property contributions.

[6]At the time of transfer to joint tenancy in 1992, the property had a debt of $82,000. Gladys then contributed $20,000 to pay down the principal. Assuming, therefore, that the debt was approximately $60,000 at the time of refinancing in 1993, this amount subtracted from a fair market value of $240,000 would result in an equity of approximately $180,000.

In this situation, the trial court must ascertain what percentage of the loan proceeds traceable to each asset is based on each party's separate property contributions. Thus here, the trial court would calculate the ratio of Gilbert's separate property contribution to the Lucerne property's total equity at the time of refinancing to ascertain what portion of the loan proceeds represented Gilbert's separate property contribution traceable to the Lucerne, Utah, and Nevada properties, and the joint bank account.

For example, if the Lucerne property's equity was $180,000 at the time of the refinancing, Gilbert's $146,000 separate property contribution may fairly be said to account for 81 percent of the loan proceeds. That is, his $146,000 separate property contribution is 81 percent of the equity of $180,000, and therefore fairly considered included in 81 percent of the loan proceeds. Thus, Gilbert may trace 81 percent of the amount of the loan proceeds spent on the Lucerne, Utah, and Nevada properties, and the joint bank account. For example, Gilbert is entitled to 81 percent of the $40,500 spent from the loan proceeds on the Utah property. While this property has apparently increased in value since the loan proceeds were paid into it, Gilbert is limited to the amount of his separate property contribution that can be traced to that particular asset. It would be unfair to allow a contributing spouse to seek greater reimbursement from a particular community property asset than the amount that he or she contributed to that asset.

Gladys's separate property contribution would be calculated using the same formula. Gladys, whose appeal is not before us, contributed $20,000 of her separate property to a hypothetical equity of $180,000, or 11 percent, and therefore could trace 11 percent of the loan proceeds spent on the Lucerne, Utah, and Nevada properties, and the joint bank account. The community is entitled to any appreciation in these assets above the amount necessary to reimburse the parties for their separate property contributions to the Lucerne, Utah, and Nevada properties, and the joint bank account.

We first consider how this formula applies to the Nevada and Utah properties, and the bank account. At the time of trial, all of these assets had *more* than sufficient equity or account balance to reimburse the parties for their separate property contributions to these assets, including Gilbert's prior separate property contribution to the Nevada property. Therefore, Gilbert and Gladys may respectively recover 81 percent and 11 percent of the amount of the loan proceeds spent on each of these assets; the community is entitled to anything above the amount necessary to reimburse the parties for their separate property contributions to each asset.

We next consider how this formula applies to the Lucerne property. As noted above, $60,000 of the loan proceeds was invested in the Lucerne

property; 81 percent of this amount, or $48,600, is traceable to Gilbert's separate property contribution, and 11 percent, or $6,600, is traceable to Gladys's separate property contribution. At the time of trial, however, the Lucerne property had only $1,000 of equity. This amount was insufficient to reimburse the parties for their separate property contributions to the Lucerne property. This property is therefore subject to the principle that "if both parties are entitled to reimbursement and the property has insufficient value to permit full reimbursement of both, reimbursement should be on a proportionate basis." (3 Sen. J. (1983-1984 Reg. Sess.) pp. 4866-4867.) Under these circumstances, the $1,000 equity was properly divided between Gilbert and Gladys by using the 88 percent and 12 percent formula used by the trial court. That is because the legislative intent to permit full reimbursement for separate property contributions indicates that separate property contributions receive greater protection from depreciation than the community's interest, provided only that any appreciation in the value of a community asset above the amount of the separate property contributions to that asset belongs to the community.

We emphasize that a contributing spouse cannot randomly seek reimbursement from any asset through which his or her separate property contribution has at some time passed. For example, assume prior to marriage, a husband buys a San Francisco property. After marriage, the property is placed in joint tenancy; at that time there is $100,000 of equity in the property. The couple immediately borrows $90,000, and buys a Los Angeles property. Ten years later they divorce. The San Francisco property is worth $500,000, and the Los Angeles property is worth nothing. Under section 2640, the husband may only be reimbursed $10,000 of his $100,000 contribution from the San Francisco property. Conversely, if the San Francisco property is worth nothing, and the Los Angeles property is worth $500,000, he may only be reimbursed $90,000 of his contribution from the Los Angeles property.

We now turn to the question of how to allocate the remaining loan obligation. The parties assert that the loan is a community indebtedness. We agree. While married, Gilbert and Gladys borrowed $180,000 secured by a community asset. (*Lezine* v. *Security Pacific Financial Services, Inc.* (1996) 14 Cal.4th 56, 64 [58 Cal.Rptr.2d 76, 925 P.2d 1002] [the liability of community property includes debts incurred for the benefit of the community]; § 910, subd. (a) ["Except as otherwise expressly provided by statute, the community estate is liable for a debt incurred by either spouse before or during marriage, regardless of which spouse has the management and control of the property and regardless of whether one or both spouses are parties to the debt or to a judgment for the debt."].)

■ The trial court is generally required to "divide the community estate of the parties equally." (§ 2550.) In satisfying this mandate, "the court must distribute both the assets and the obligations of the community so that the residual assets awarded to each party after the deduction of the obligations are equal." (*In re Marriage of Fonstein* (1976) 17 Cal.3d 738, 748 [131 Cal.Rptr. 873, 552 P.2d 1169]; *In re Marriage of Barnert* (1978) 85 Cal.App.3d 413, 420 [149 Cal.Rptr. 616] ["the trial court must add all the community assets, deduct all the community obligations and divide the residual assets equally"].) "To the extent that community debts exceed total community and quasi-community assets, the excess of debt shall be assigned as the court deems just and equitable, taking into account factors such as the parties' relative ability to pay." (§ 2622, subd. (b).)

At oral argument, Gladys asserted that she did not perceive any unfairness if tracing were permitted in this case because the parties were only married approximately three years. She expressed concern, however, both at oral argument and in her brief, that allowing tracing would lead to unfairness in a longer marriage. We believe this concern has already been considered by the Legislature in formulating section 2640. Moreover, the result in this situation is not inherently unfair.

To use an example similar to that presented by Gladys, suppose a wife contributes $300,000 of her separate property so that the couple can purchase a home for the same amount. They immediately refinance, taking out a $200,000 30-year loan, and use this money to purchase a vacation home. After 15 years, they divorce. At this time, the original house has only $100,000 of equity, and most of what has been paid on the loan is interest, not principal. The vacation home still has $200,000 of equity. Under section 2640, the wife is reimbursed for her $300,000 contribution by receiving $100,000 from the original home, and $200,000 from the vacation home. The community receives nothing, and is responsible for the remaining loan, obligation.

This result is not inherently unfair. The $300,000 contributed by the wife made the acquisition of both homes possible. She conceivably may have spent years sacrificing for and saving these funds, just as the community spent 15 years making payments on the $200,000 loan. There is always a risk to both the contributing party and the community that the value of the property purchased will decrease. Again, however, the legislative intent to permit full reimbursement for separate property contributions indicates that such contributions receive greater protection from depreciation than the community's interest, provided only that any appreciation in the value of a community asset above the amount of the separate property contributions to that asset belongs to the community.

CONCLUSION

The judgment of the Court of Appeal is reversed and the case remanded for proceedings consistent with this opinion.

George, C. J., Mosk, J., Werdegar, J., and Chin, J., concurred.

**KENNARD, J.,** Concurring and Dissenting.—I agree with the majority that subdivision (b) of Family Code section 2640 permits a spouse, upon dissolution of marriage, to obtain reimbursement for separate property contributions not only from the property to which the contribution was originally made but also from property acquired later with funds traceable to the original contribution. As the majority explains, this result serves the legislative purpose underlying Family Code section 2640 to encourage spouses to freely contribute their separate assets to the marital community, secure in the knowledge that they may recover their separate property contributions if the marriage ends in dissolution.

I do not agree, however, with the tracing method that the majority adopts. In my view, the majority's method is not only unnecessarily complicated and cumbersome, but it is also insufficiently protective of the separate property reimbursement right.

The point of disagreement is illustrated by this hypothetical. A husband contributes $50,000 of his separate property to pay down the indebtedness on community real property (Property A), resulting in a total community equity in Property A of $100,000. Later, the spouses borrow $50,000, conveying to the lender a second trust deed on Property A, thereby reducing the community's equity in Property A to $50,000. The spouses use the $50,000 loan proceeds to purchase another parcel of real property (Property B). Later still, when the parties dissolve their marriage, Property A has become worthless while Property B retains its equity value of $50,000. How much of his $50,000 separate property contribution may the husband recover?

As I construe Family Code section 2640, after the husband made his separate property contribution to Property A, the whole of the community's equity in Property A was burdened with the husband's potential reimbursement claim. When part of that burdened equity was removed from Property A and invested in Property B, all of the funds so invested were likewise burdened with the husband's potential reimbursement claim. Upon dissolution of the marriage, the husband could seek reimbursement from either Property A or Property B, the only limitation being that the husband could

not obtain from Property B a sum greater than the amount of the loan proceeds invested in property B. In this hypothetical, accordingly, the husband could obtain the full $50,000 reimbursement from Property B.

By contrast, the majority would permit the husband to recover no more than $25,000 from Property B and would preclude any reimbursement for the balance. Because the husband's separate property contribution to Property A represented only half of the equity value of Property A, the majority would allow him to trace only half of the loan proceeds to Property B (even though all of the equity in Property A was burdened with the husband's reimbursement claim). The majority's approach is thus more complex, because it requires a determination of the equity value of Property A at the time of refinancing and an apportionment of the loan proceeds, and it is less protective of spouses' separate property reimbursement rights, because it permits those rights to be diluted when funds invested in one asset are later withdrawn through refinancing and spread among other community assets. Spouses may be hesitant to diversify their investments in this manner if they understand that the result will be a substantial weakening of their ability to obtain reimbursement for separate property contributions.

For these reasons, I am unable to concur in part II.C. of the majority opinion, entitled "Tracing Method." To the extent that the majority's disposition obligates to the trial court to follow the tracing method that the majority describes, I dissent.

**BAXTER, J.,** Concurring and Dissenting.—I concur in the majority's conclusion that a spouse's statutory right, upon the division of community property, to reimbursement of his or her separate property contribution to the community estate (Fam. Code, § 2640, subd. (b) (§ 2640(b)))[1] is not confined to reimbursement from the specific asset to which the contribution was originally made. Section 2640(b) makes clear that "[i]n the division of the *community estate*," a spouse is entitled to reimbursement of his or her "contributions to the acquisition of *the property* to the extent the [spouse] traces the contributions to a separate property source." (Italics added.) The statute does not state or imply that the reimbursement must come only from the particular community asset to which the spouse contributed, so that an intervening disposition of that distinct item of property on behalf of the community might arbitrarily alter, or even extinguish, the right of reimbursement.

On the contrary, the phrase "the property," as used in section 2640(b), appears to be a reference to the "community estate," mentioned earlier in the

[1]All further unlabeled statutory references are to the Family Code.

subdivision, which is subject to division upon dissolution of marriage. Thus, the statute seems to contemplate that the right of reimbursement extends fungibly to the value of the entire "community estate," as it exists at the time of division, up to the full amount of the contributions made to that estate from separate property sources. This view is consistent with the statute's clear policy that, when the "community estate" is divided, a spouse "shall" be reimbursed, "off the top" as it were, for the dollar amount of his or her separate property contributions.

For this reason, I cannot agree with the majority's proposed formula for tracing the separate property contributions to various individual assets subsequently acquired by the community. Even though the majority correctly conclude that the original contribution can be traced through to such subsequently acquired assets, their method of doing so unfairly insulates portions of the "community estate," and even of assets specifically traceable to the original contribution, from full participation in the burden of reimbursement.

Under the majority's formula, if the wife makes a separate property contribution to asset A, asset A is later refinanced, and the loan proceeds are used to redistribute the community's equity in asset A among assets A, B, C, and D, *only those* assets are burdened with the wife's right of reimbursement, and *each* is individually burdened only to the extent the investment *in that particular asset* includes *a portion* of the wife's original separate property contribution to asset A. The result is that if, by the time of division, assets A and B have plummeted in value, while assets C and D have risen in value, the appreciation in assets C and D will be deemed unburdened by, and insulated from, the right of reimbursement, even if the community's aggregate equity in assets A, B, C, and D, or in the "community estate" as a whole, is *insufficient* to reimburse the wife's original separate property contribution dollar for dollar.

The inequity of this approach is illustrated by the majority's treatment of the facts of this case. Here, the husband contributed $146,000, and the wife contributed $20,000, to the Lucerne property, creating a community equity value of $166,000. The Lucerne property appreciated thereafter, and was later refinanced for its apparent full equity value at that time, $180,000. The $180,000 of loan proceeds was used to pay down the existing first mortgage on the Lucerne property ($60,000), to acquire and improve the Utah property ($40,500), to pay off the mortgage on the Nevada property ($62,000), and to

make a deposit to a community bank account ($16,000).[2] At the time of division, the community's equity in the Utah property had increased to $74,500, its "traceable" equity in the Nevada property remained $62,000 ($125,000 minus a $63,000 prior separate property contribution by the husband), and its equity in the bank account remained $16,000, but its equity in the Lucerne property had dropped precipitously to $1,000. Thus, the community's total remaining equity in these particular assets, insofar as derived from the refinance of the Lucerne property, was only $153,500, an amount insufficient to fully reimburse the $166,000 of original separate property contributions to the Lucerne property.

Even though, at the time of division, the total remaining community equity in the Lucerne property and the properties it financed fell below the sum of the original separate property contributions to the Lucerne property, the majority decline to deem even the full amount of this remaining equity available for reimbursement. Instead, the majority hold that as reimbursement under section 2640(b), the husband and wife may recover from each of the Nevada property, the Utah property, and the bank account, no more than a percentage of the loan proceeds *invested in that asset*, which percentage equals the ratio of the amount of their original Lucerne property contributions ($166,000) to the original gross amount of the Lucerne property refinance loan ($180,000). (Maj. opn., *ante*, at pp. 922-923.) Under this formula, all remaining equity in these assets, including the substantial, atypical appreciation in the Utah property, is free of any right of reimbursement, and is subject to equal division.

Even Justice Kennard's concurring and dissenting opinion would insulate substantial portions of the aggregate equity in the Lucerne, Utah, and Nevada properties, and the bank account, from the right of reimbursement. Justice Kennard would hold that when the asset to which the original separate property contribution was made is refinanced, and the proceeds used to acquire equity in still other assets, the contributing spouse may obtain reimbursement from each such subsequent asset up to the *full amount* of the loan proceeds invested in that asset. But even that approach, as I understand it, would here accord the additional value of the Utah property to the community, free of any right of reimbursement. (See conc. and dis. opn. of Kennard, J., *ante*, at pp. 925-926.)

Indeed, the assumptions of the majority, and of Justice Kennard, that reimbursement for a particular contribution is available only from those

---

[2] Disposition of the remaining $1,500 of the $180,000 loan proceeds is apparently unknown.

specific items of community property that can be "traced" to that contribution produces manifest unfairness even in the simplest situation. Suppose the husband contributed $50,000 of his separate property to acquire community asset A, and the wife contributed $50,000 of her separate property to acquire community asset B. At the time of division, asset A has risen in value to $100,000, while asset B has become valueless. Both contributions were made for the benefit of the community as a whole, yet, under the rule accepted by the majority and Justice Kennard, the reimbursements will differ. Because community asset A proved a good investment, the husband will recoup his entire $50,000, but because community asset B did not fare ·well, the wife will recover none of her contribution.

In my view, this approach does not properly protect the statutory right to reimbursement˙ from the "community estate" of separate property contributions previously made to that "estate." Under section 2640(b), the community is entitled to any appreciation in the value of community assets above the dollar amount of separate property contributions. However, that entitlement should not arise until the *aggregate* value of the "community estate" exceeds the amount necessary fully to reimburse all such contributions dollar for dollar. It is the "community estate" as a whole, not mere individual components thereof, that is "the property" to which the separate property contributions were made, and which is thus subject to the right of reimbursement. A spouse's right to reimbursement of separate property contributions for the benefit of the "community estate" should not depend on whether the value of the particular assets to which that contribution can be "traced" rose or fell.[3]

Thus, if the husband and wife each contribute $50,000 to separate community assets, each should recover his or her contribution, dollar for dollar, to the extent the value of the "community estate" permits such recoupment. If the "community estate" is insufficient to permit full recoupment, partial reimbursement to each party should be in proportion to the amounts of their respective original contributions.

Besides best reflecting the statutory policy in every situation, this approach eliminates the complex analysis that potentially arises from the

---

[3]Section 2640(b) provides that a spouse is entitled to reimbursement from the "community estate" for the spouse's contributions thereto "to the extent the [spouse] traces the contributions to a *separate property source*." (Italics added.) This "tracing" language appears to mean simply that the spouse must prove the *existence* of the contribution, its *amount*, and its *separate property origin*. The language does not, by its terms, require complex "tracing" peregrinations to determine what particular assets in the "community estate" were *derived from* the original contribution.

majority's insistence on tracing a separate property contribution through any number of subsequent transactions to individual assets in the community estate at the time of division. As I understand section 2640(b), such intervening transactions, and the particular fates of *individual* community assets, simply do not matter. Instead, the value of the entire "community estate" at the time of division, however composed and achieved, is presumed to represent the total separate property contributions to that estate, up to the full dollar amount of such contributions. The community is then entitled to any value above that amount. Within this formula, all community assets at the time of division, regardless of their derivation, share pro rata in the burden of reimbursement until it is satisfied.[4]

Despite the logic and fairness of my proposed formula, I realize that peculiarities in the procedural posture of this particular litigation may preclude application of that formula to the instant "community estate" as a whole. Besides the specific properties under discussion here, the "community estate" in this case includes numerous other real estate holdings, to most or all of which separate property contributions were made by the husband, the wife, or both. At the time of division, the community equity in each of these other holdings was apparently sufficient to reimburse the separate property contribution or contributions thereto, and the parties have stipulated to the allocation of separate and community interests in each. As the majority indicate, the parties here dispute only the extent to which the separate property contributions *to the Lucerne property* can be recouped from the *specific assets in which proceeds derived from the refinance of the Lucerne property were invested.*

Still, in this case, I would at least deem the *Lucerne, Nevada, and Utah properties and the bank account in the aggregate* to be subject to the husband's and the wife's rights of reimbursement up to the amount of $166,000, the dollar sum of their original separate property contributions to the Lucerne property. Because, as noted above, the aggregate value of the remaining community equity in these particular assets is less than $166,000, the community is not entitled to retain any share of that aggregate value. I

[4]Section 2640 speaks of reimbursement for separate property contributions to the "acquisition" of property (subd. (b)) and defines such contributions to include "downpayments, payments for improvements, and payments that reduce the principal of a loan used to finance the purchase or improvement of the property" but not interest, tax, and insurance payments (subd. (a)). Thus, the "contributions" eligible for reimbursement appear to be only those directly related to obtaining or increasing equity in tangible or intangible real or personal property. Hence, I do not suggest that separate property contributions to community living expenses would be eligible for reimbursement from the "community estate" as a whole, or at all.

would divide the remaining equity value of these assets between the husband and wife in direct proportion to their original contributions to the Lucerne property, i.e., 88 percent to the husband and 12 percent to the wife.

I would reverse the judgment of the Court of Appeal and remand for proceedings consistent with this opinion.