Filed 6/16/15

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| In re Marriage of JOHN and JEAN LAFKAS. | B243635 |
| | (Los Angeles County Super. Ct. No. GD017215) |
| JOHN LAFKAS,<br><br>Appellant,<br><br>v.<br><br>JEAN LAFKAS,<br><br>Respondent. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Louise Halevy, Temporary Judge, and Dianna Gould-Saltman, Judge.  Reversed in part and affirmed in part.

Law Offices of Jeanne Collachia and Jeanne Collachia for Appellant.

Kearney | Baker and Gary W. Kearney for Respondent.

_____

Husband owned one-third of a real estate partnership for several years prior to marrying wife. During the parties' marriage, the partnership modified the partnership agreement. The modified agreement stated the names of each partner, including husband and wife as owners of a one-third interest. Husband and wife filed for dissolution within a year.

On appeal, husband contends the partnership interest is his separate property, because the documents do not contain an express declaration transmuting the character of the property interest as required under Family Code section 852.[1] Wife asserts that the partnership interest is community property under the joint title presumption of section 2581, which provides that property acquired during marriage in joint form is presumed to be community property. We hold that when a spouse places separate property in joint title form, the transmutation requirements of section 852 must be satisfied before the joint title presumption of section 2581 applies. The documents in this case do not contain an express transmutation of husband's separate property interest in the partnership, and therefore, it remained husband's separate property.

We asked the parties for additional briefing on the character of loan proceeds received by the partnership after the modification. We remand the matter for the trial court to determine whether the lenders intended to rely on the parties' community property to satisfy the loans. If so, the community acquired a proportionate share of husband's interest in the partnership. Husband contends the trial court abused its discretion by awarding excessive attorney fees to wife. The award of attorney fees to wife must be reversed for a new determination in light of our opinion. We reverse and remand for further proceedings.

---

[1] All further statutory references are to the Family Code, unless otherwise stated.

**FACTS**

John Lafkas began working as a police officer in 1966. In 1971, Lafkas formed Smile Enterprises to invest in real property with friends Eric Cleworth and Nicholas Roberts. Each partner contributed $3,333 in exchange for one-third of the profits and losses of the partnership. Other than occasional distributions to the partners, the profits were reinvested in the partnership.

Lafkas married in 1972, had a daughter, and divorced in 1980. The partnership agreement was extended at the end of its term. The statement of partnership recorded in August 1982, listed the names of each partner of Smile Enterprises as follows: "John Lafkas; an unmarried man, [¶] Eric Cleworth; a married man, and [¶] Nicholas P. and Sylvia V. Roberts; husband and wife."

In 1985, Smile Enterprises purchased property on Maple Avenue in Monrovia. The income from rental units on the property was sufficient to meet all of the property's expenses. Smile Enterprises' expenses were paid from profits held in its bank accounts. Smile Enterprises purchased a property in Pasadena, and at some point, Eric Cleworth's wife, Dorcas Cleworth, was added to the partnership.

On December 15, 1990, Lafkas married Jean Doane.[2] Lafkas was 48 years old and Doane was 36 years old at the time. Doane held a master's degree in educational psychology, obtained a degree in education during the marriage, and began teaching elementary school in 1992. Lafkas did not expend any money or effort on behalf of Smile Enterprises.

In 1995, the partnership decided to exchange the Monrovia property through an Internal Revenue Code section 1031 tax deferred exchange. (26 U.S.C. § 1031.) Smile Enterprises entered into an agreement with a qualified intermediary which was signed by the Robertses, the Cleworths, and Lafkas. They also entered into escrow instructions on

---

[2] Doane, formerly Jean Lafkas, will be referred to by her current name for ease of reference.

behalf of Smile Enterprises. The partnership identified two properties on Harvill Lane in Riverside, California, for the exchange. The total cost of the properties was more than the amount held in escrow from the Monrovia property. In March 1995, the Robertses, the Cleworths, and Lafkas applied for a loan to finance the balance of the purchase price of the properties. Smile Enterprises' net worth at the time was between $500,000 and $600,000.

Lafkas asked Doane to participate in the transaction. Lafkas testified at trial that Smile Enterprises qualified for the loan based on its assets and the expected income from the properties. After a discussion with the loan officer, he believed that because he was married, the bank required the addition of Doane to the partnership and the loan application. Doane testified at trial that her credit was necessary for the partnership to qualify for the loan to purchase the Riverside properties.

A two page document was prepared entitled, "Modification and Extension of General Partnership Agreement." The first page states, in pertinent part, "Comes now SMILE ENTERPRISES and files herewith a Modification and Extension of its General Partnership Agreement of August 16, 1971 as follows: [¶] 1. Pursuant to the provisions of the original General Partnership Agreement, the term of the partnership herewith is extended and is to be in effect from August 16, 1981 continuing until December 31, 2026 . . . 3. The name of each of the partners is as follows: [¶] John and Jean Lafkas, husband and wife, as to 1/3 interest [¶] Eric and Dorcas Cleworth, husband and wife, as to 1/3 interest [¶] Nicholas P. Roberts . . . and Sylvia V. Roberts . . ., husband and wife, as to 1/3 interest. [¶] 4. The above are all of the partners of said partnership. [¶] 5. Any one partner may act on behalf of the partnership to carry out the business of the partnership as specified in the original General Partnership Agreement." The second page contained the signatures of the individuals.

A statement of partnership was recorded that states, "The names of each of the Partners are John Lafkas, Jean Lafkas, Eric Cleworth, Dorcas Cleworth, Nick Roberts, aka Nicholas Roberts, aka, Nicholas P. Roberts, and Sylvia Roberts, aka Sylvia V. Roberts pursuant to the extension and modification agreement of the Partnership

4

Agreement dated as of [August 16, 1971]." It stated that the signature of all partners was required to execute any contracts of sale, notes, deeds or security agreements on behalf of the partnership, but any other documents may be signed by any of the partners. Each of the named individuals signed the statement in June 1995. Lafkas signed it on June 12, 1995.

The partnership paid $252,000 for each of the Riverside properties, a total of $504,000, to Blythe Limited Partnership. The partnership provided deposits totaling $108,646.16, which included $51,843.64 for one property and $56,802.52 for the other. First and second deeds of trust were executed on behalf of the borrower Smile Enterprises by each of the six individuals in their capacity as general partners. Home Savings loaned $164,500 for each property, and Blythe took a second deed of trust for each property in the amount of $37,500. The total amount borrowed was $404,000. The grant deeds recorded in July 1995, reflect that Blythe granted the real property in Riverside to Smile Enterprises.

Lafkas did not invest any further funds or effort in the Riverside properties. Ten months later, on April 22, 1996, Lafkas and Doane separated. Lafkas took service-connected disability retirement effective June 30, 1996.

## PROCEDURAL HISTORY

Lafkas filed a petition for legal separation on May 14, 1996. Doane filed a response requesting dissolution of the marriage on May 31, 1996. A judgment of dissolution as to marital status only was entered nunc pro tunc as of May 10, 2000.

Lafkas moved for a separate trial of the interest in Smile Enterprises, which Lafkas claimed was his separate property and Doane claimed was community property. A trial was held before Commissioner Louise Halevy, Judge Pro Tem of the Los Angeles Superior Court, on September 29, 2003; January 20, 2004; and May 19 and 20, 2005.

Lafkas argued that none of the documents in the case, including the modification of the partnership agreement, contained an express declaration transmuting his separate

5

property interest in the partnership. Doane argued that the modification made her a partner as to an undivided one-third interest under partnership law, and community property law did not apply.

Lafkas testified to the following additional facts. He expected the rental income from the Riverside properties would be sufficient to pay the mortgage and expenses of the properties. If not, Smile Enterprises held retained earnings and profits in a partnership savings account to be used for the expenses of operating the Riverside properties. The Smile Enterprises partners qualified for the loan without Doane's participation. Sylvia and Dorcas have their own businesses and were partners in Smile Enterprises prior to the partnership's application for a loan to purchase the Riverside properties. After speaking with the loan officer, however, Lafkas believed Doane had to be included on the partnership agreement and the loan application because they were married. He told Doane that she needed to be added to the documents in order to satisfy the lender's requirements. He believes her credit was reviewed in connection with the purchase.

Lafkas believed that he owned one-third of Smile Enterprises before and after the modification. He did not believe that he had assigned any of his interest in Smile Enterprises to Doane or made her a legal owner of Smile Enterprises. Lafkas told Doane that she was being made a partner to facilitate the purchase of the properties and as long as they were together, she would have a share. In other words, as long as they were married, she would get what he got. He did not intend to change the character of his partnership or convert his separate property interest in Smile Enterprises.

Doane testified to the following additional facts. She did not own any separate real property, but Lafkas owned other real property that he had purchased before marriage. They had discussed owning property together. He said Dorcas had found properties in Riverside, and he asked her to become a partner in Smile Enterprises. He said Smile Enterprises needed her salary to qualify for the loan for the properties and she would be required to sign loan documents to purchase the properties. He said the properties ran themselves. They discussed liability. When Lafkas refinanced other

6

properties that he owned, he asked her to sign quitclaim deeds. In at least one transaction, she was placed on the title of the property to facilitate refinancing the loan, then she quitclaimed her interest in the property. She signed the quitclaim deeds to be relieved of liability for the property. She wanted to know why he would put her on a partnership agreement that would increase her liability. He said it was a great opportunity. She told him that she would not sign a quitclaim deed. He took her to see the property. Two or three weeks later, she signed the modification of the partnership agreement. She believed she became a partner when she signed the modification and she believed she was liable for anything that might have occurred with respect to the partnership and its assets since the partnership's inception in 1971. The partners went to dinner and welcomed her to the partnership. She believed Dorcas became a partner at the same time. She knew proceeds from the sale of the Monrovia property were going to be used as part of the consideration for the Riverside properties.

In 2003, during trial, Smile Enterprises sold the Pasadena property. One of the Riverside properties was sold in 2003 for $699,000, and the other in 2005 for $940,000. The partnership was dissolved.

On December 15, 2005, Commissioner Halevy entered a further judgment on bifurcated issues. The court found the modification amounted to a new partnership agreement and the Riverside properties were property acquired during the marriage under section 760. Lafkas had the use of Doane's name and credit until the sale of the properties. The modification substituted Lafkas and Doane for a combined one-third share in place of Lafkas's sole ownership of one-third share in the original agreement. By referring to the parties as "husband and wife," the partnership was acquired in joint form as required by section 2581. The creation of the modification agreement at Lafkas's behest converted Lafkas's one-third interest under the prior agreement to a shared one-third interest taken as "husband and wife," which satisfied the requirement of an express declaration under section 852, subdivision (a).

The trial court found it was not the parties' intent to wholly convert Lafkas's holdings prior to June 12, 1995, to community property, however. The statement of

7

partnership, the executed and notarized modification agreement, and the taking of joint property, show the parties intended to change the character of the partnership interest from June 12, 1995, forward. The court found Lafkas and Doane took an undivided one-third share of the partnership from the date of the modification forward. Lafkas transmuted his one-third interest in Smile Enterprises and its holdings to community property only from and after June 12, 1995.

He retained a separate property interest in Smile Enterprises. The separate property component was: one-third of rents acquired prior to June 12, 1995, one-third of rents after June 12, 1995, derived from property held prior to June 12, 1995, and one-third of the value of property held by Smile Enterprises prior to June 12, 1995, and the appreciation of the value of the partnership holdings from the inception of the partnership until June 12, 1995, which was later determined to be $63,215. The remainder of the partnership interest, including properties acquired by the partnership on and after June 12, 1995, and appreciation, was community property subject to equal division between the parties.

Lafkas filed a notice of appeal from the further judgment on bifurcated issues on February 10, 2006, but this appellate court held it was a nonappealable interlocutory order and dismissed the appeal. (*In re Marriage of Lafkas* (2007) 153 Cal.App.4th 1429, 1434.)

Trial was heard on remaining issues on September 17, 18, and 19, 2008; November 6 and 10, 2008; December 16, 2008; January 7, 9, 12 and 13, 2009; February 5 and 6, 2009; and August 21 and 28, 2009. Commissioner Halevy presided over the trial, but was unable to rule on the issues. Judge Dianna Gould-Saltman reviewed reporter's transcripts of the proceedings and issued a tentative decision on November 15, 2011. On May 12, 2012, Judge Gould-Saltman issued a minute order ruling on attorney fees. Judge Gould-Saltman ordered Lafkas to pay attorney fees and costs of $160,000 from his portion of the proceeds from the sale of the Riverside properties and an additional $15,000 to Doane's appellate counsel. Lafkas had previously paid $20,000 to Doane's trial counsel. The total attorney fees paid on Doane's behalf was $195,000.

8

Lafkas filed a notice of appeal on August 14, 2012, from the judgment.

**DISCUSSION**

**General Characterization Principles and Standards of Review**

"The character of property as separate or community is determined at the time of its acquisition.  [Citations.]"  (*See v. See* (1966) 64 Cal.2d 778, 783.)  "Property that a spouse acquired before the marriage is that spouse's separate property.  (Fam. Code, § 770, subd. (a)(1).)  Property that a spouse acquired during the marriage is community property (*id.*, § 760) unless it is (1) traceable to a separate property source [citations], (2) acquired by gift or bequest (Fam. Code, § 770, subd. (a)(2)), or (3) earned or accumulated while the spouses are living separate and apart (*id.*, § 771, subd.(a))."  (*In re Marriage of Valli* (2014) 58 Cal.4th 1396, 1400 (*Valli*).)

The court's characterization of property as community or separate determines the division of the property between spouses in a marital dissolution proceeding.  (*Valli, supra*, 58 Cal.4th at pp. 1399-1400.)  In general, "[a]ppellate review of a trial court's finding that a particular item is separate or community property is limited to a determination of whether any substantial evidence supports the finding.  [Citations.]"  (*In re Marriage of Dekker* (1993) 17 Cal.App.4th 842, 849.)

When the trial court's construction of a written agreement is challenged on appeal, however, and no extrinsic evidence is necessary to resolve any ambiguity or uncertainty, interpretation of the contract is subject to de novo review.  (*Morgan v. City of Los Angeles Bd. of Pension Comrs.* (2000) 85 Cal.App.4th 836, 843.)  "Under statutory rules of contract interpretation, the mutual intention of the parties at the time the contract is formed governs interpretation.  (Civ. Code, § 1636.)  Such intent is to be inferred, if possible, solely from the written provisions of the contract.  (*Id.,* § 1639.)  The 'clear and explicit' meaning of these provisions, interpreted in their 'ordinary and popular sense,' unless 'used by the parties in a technical sense or a special meaning is given to them by

9

usage' (*id.,* § 1644), controls judicial interpretation. (*Id.,* § 1638.) Thus, if the meaning a layperson would ascribe to contract language is not ambiguous, we apply that meaning. [Citations.]" (*AIU Ins. Co. v. Superior Court* (1990) 51 Cal.3d 807, 821-822.)

Similarly, "[i]n deciding whether a transmutation has occurred, we interpret the written instruments independently, without resort to extrinsic evidence. [Citations.] Under the circumstances, we are not bound by the interpretation given to the written instruments by the trial court. [Citation.]" (*In re Marriage of Starkman* (2005) 129 Cal.App.4th 659, 664.)

We also review the interpretation of a statute and its application to undisputed facts de novo. (*MacIsaac v. Waste Management Collection and Recycling, Inc.* (2005) 134 Cal.App.4th 1076, 1082.) "In interpreting the statutory language at issue, '[w]e begin with the fundamental rule that our primary task is to determine the lawmakers' intent.' [Citation.] The process of interpreting the statute to ascertain that intent may involve up to three steps. [Citations.] As other courts have noted, the key to statutory interpretation is applying the rules of statutory construction in their proper sequence. [Citations.] We have explained this three-step sequence as follows: 'we first look to the plain meaning of the statutory language, then to its legislative history and finally to the reasonableness of a proposed construction.' [Citation.]" (*Ibid.*)


**Nature of Partnership Interest at Time of Marriage**


Lafkas acquired his one-third interest in Smile Enterprises prior to the parties' marriage, and it is undisputed that when the parties married, the partnership interest was his separate property. We note that the applicable partnership law in this case is the Uniform Partnership Act (UPA) (former Corp. Code, § 15001 et seq.). Effective January 1, 1997, the UPA was repealed and replaced with the Uniform Partnership Act of 1994 (UPA 1994) (Corp. Code, § 16100 et seq.), but the former act governs rights that accrued or actions that commenced prior to January 1, 1997. (Corp. Code, § 16112.) The property rights at issue in this case accrued prior to January 1, 1997, since the

10

modification agreement was signed in 1995 and the dissolution action filed in 1996, thus the UPA applies.

A partner's interest in partnership profits is personal property under either act. (Former Corp. Code, § 15026; Corp. Code, § 16502; *Kenworthy v. Hadden* (1978) 87 Cal.App.3d 696, 701.)  This personal property interest is distinguishable from rights in specific partnership property.   Under the UPA, partners co-owned specific partnership property as tenants in partnership with the other partners (former Corp. Code, § 15025), but a partner's interest in specific partnership assets was not community property (former Corp. Code, § 15025, subd. (2)(e)).  A partner's interest in partnership profits, however, is separate or community property.  (*McCall v. McCall* (1934) 2 Cal.App.2d 92, 94.)[3]

Lafkas owned the one-third interest in the profits of Smile Enterprises as his separate property prior to the execution of the modification agreement.  His separate property interest was in the partnership's profits and surplus, not in specific property held by the partnership.

**Effect of Modification Agreement**

The modification agreement stated Lafkas and Doane, as husband and wife, own an undivided one-third interest in the partnership.  Lafkas contends the modification

---

[3] In comparison, current partnership law provides:  "A partnership is an entity distinct from its partners."  (Corp. Code, § 16201.)  "Property acquired by a partnership is property of the partnership and not of the partners individually."  (Corp. Code, § 16203.) A partner does not co-own partnership property and has no interest in partnership property that can be transferred.  (Corp. Code, § 16501.)  "The only transferable interest of a partner in the partnership is the partner's share of the profits and losses of the partnership and the partner's right to receive distributions.  The interest is personal property."  (Corp. Code, § 16502.)  "'Partnership interest' or 'partner's interest in the partnership' means all of a partner's interests in the partnership, including the partner's transferable interest and all management and other rights."  (Corp. Code, § 16101, subd. (12).)

agreement did not change the character of his separate property interest in the partnership to joint ownership, because it did not satisfy the requirements of section 852 for a valid transmutation. Doane contends that since the modification agreement provides for the parties to hold title in joint form, the joint title presumption of section 2581 applies and Lafkas is limited to reimbursement of his contribution under the provisions of section 2640. We conclude the transmutation requirements of section 852 must be satisfied before the joint title presumption of section 2581 applies.

## A. History of Family Code Sections 2851 and 852

Sections 2851 and 852 both evolved in response to *In re Marriage of Lucas* (1980) 27 Cal.3d 808 (*Lucas*). In *Lucas*, a husband and wife purchased a home during marriage for $23,300. Wife used $6,351.57 of her separate property for the down payment and spent $2,962 of her separate property for improvements. They took title as "Gerald E. Lucas and Brenda G. Lucas, Husband and Wife as Joint Tenants." (*Id.* at p. 811.) At the time of dissolution, the net equity in the home was approximately $41,650. (*Id.* at pp. 811-812.) During marriage, the couple also traded in a community property vehicle toward the purchase of a motor home. Wife used her separate property to pay the majority of the purchase price. The parties' intent was to use the motor home for their family, and husband did not object to putting title in wife's name alone. (*Id.* at p. 817.)

The *Lucas* court noted that "where there is no written indication of ownership interests between the spouses, the general presumption of community property may be overcome simply by tracing the source of the funds used to acquire the property to separate property. [Citations.]" (*Lucas*, *supra*, 27 Cal.3d at p. 815.) Before the law was modified by statute in 1965, spouses could agree to alter the character of their property by specifying a form of title, which raised a rebuttable presumption that the parties' ownership interests were as stated in the title. (*Id.* at p. 813; see, e.g., *Socol v. King* (1950) 36 Cal.2d 342, 345-346; *Tomaier v. Tomaier* (1944) 23 Cal.2d 754, 757-759.)

12

The form of title presumption could be rebutted by evidence of a contrary agreement, but not simply by tracing the source of the property. (*Lucas*, *supra*, at p. 813.)

When spouses owned a residence in joint tenancy, it was presumed to be separate property in which each spouse held one-half interest. (*Lucas*, *supra*, 27 Cal.3d at p. 813.) In dissolution proceedings, the court could not award the residence to one spouse as a family home unless the title presumption was rebutted by evidence of an agreement. (*Id.* at pp. 813-814.) But spouses took title in joint tenancy primarily because real estate professionals presented them with deeds in joint tenancy form, without understanding the difference between joint tenancy and community property. (*Id.* at p. 814.)

In 1965, the Legislature added a provision to former Civil Code section 164 to solve these problems in dissolution proceedings. (*Lucas*, *supra*, 27 Cal.3d at p. 814.) As amended, Civil Code section 164 provided that a single family residence acquired by a husband and wife during marriage as joint tenants was presumed to be community property for the purposes of division of property at divorce. (*Ibid.*) Civil Code section 164 was replaced in 1969 with a nearly identical provision in former Civil Code section 5110. (*Id.* at p. 814, fn. 2.)

The *Lucas* court held, based on the form of title and Civil Code section 164, that the house belonged entirely to the community, unless on remand the trial court found the parties had an agreement or understanding that wife would retain a separate property interest. (*Lucas*, *supra*, 27 Cal.3d at pp. 815-816.) The court reasoned, "To allow a lesser showing could result in unfairness to the spouse who has not made the separate property contribution. Unless the latter knows that the spouse contributing the separate property expects to be reimbursed or to acquire a separate property interest, he or she has no opportunity to attempt to preserve the joint ownership of the property by making other financing arrangements. The act of taking title in a joint and equal ownership form is inconsistent with an intention to preserve a separate property interest. Accordingly, the expectations of parties who take title jointly are best protected by presuming that the specified ownership interest is intended in the absence of an agreement or understanding to the contrary." (*Id.* at p. 815.)

13

The *Lucas* court noted that on remand, if the trial court found the house belonged entirely to the community, wife would not be entitled to reimbursement of her separate property contribution to the property unless the parties had agreed to reimbursement. (*Lucas*, *supra*, 27 Cal.3d at p. 816.)  It was well-established that a spouse who used separate property for community purposes was deemed to be making a gift to the community unless there was an agreement otherwise.  (*Ibid*.)  The *Lucas* court similarly concluded there was substantial evidence to support the trial court's finding that husband made a gift of his community property interest in the motor home to wife, because title to the motor home was taken in wife's name alone, husband was aware of it, and he did not object.  (*Id.* at p. 818.)

## B.  Enactment of Joint Title and Reimbursement Statutes

The Legislature enacted several statutes in response to *Lucas*.  In 1983, the Legislature adopted provisions that are now codified as sections 2580, 2581, and 2640. (Former Civ. Code, §§ 4800.1, subds. (a) & (b), 4800.2, respectively.)

Section 2581 provides that property acquired in joint title during marriage is presumed to be community property upon dissolution.[4]  The presumption may be rebutted only by a clear statement in the title document by which the property is acquired that the property is separate and not community property, or proof of a written agreement that the property is separate.  (§ 2581.)  Under section 2640, a party will be reimbursed

_____

[4] Section 2581 provides:  "For the purpose of division of property on dissolution of marriage or legal separation of the parties, property acquired by the parties during marriage in joint form, including property held in tenancy in common, joint tenancy, or tenancy by the entirety, or as community property, is presumed to be community property.  This presumption is a presumption affecting the burden of proof and may be rebutted by either of the following:  [¶]  (a) A clear statement in the deed or other documentary evidence of title by which the property is acquired that the property is separate property and not community property.  [¶]  (b) Proof that the parties have made a written agreement that the property is separate property."

for contributions to the acquisition of community property to the extent the party traces the contributions to a separate property source unless the party waived the right to reimbursement in writing.  (§ 2640.)  The amount reimbursed does not include interest or appreciation, and cannot exceed the property's net value.  (*Ibid*.)

The California Law Revision Commission (the Commission) commented that sections 4800.1 and 4800.2 were originally enacted to correct injustice under the former law in two ways.  (Cal. Law Revision Com. com., 29D West's Ann. Fam. Code (1994 ed.) foll. § 2580, p. 90-91.)  First, the statutes were to reverse the Supreme Court's holding in *Lucas* that separate funds used to acquire a community asset were a gift to the community absent an express agreement otherwise.  (*Ibid*.)  "The Lucas decision was widely considered to cause injustice to persons who contributed their separate funds for use by the community and then lost the funds entirely to the community at dissolution of marriage.  Often the parties were unaware that taking title in joint tenancy had the effect of making a gift of the separate property to the community."  (*Id*. at p. 91.)

Second, the legislation changed the rule that a spouse could rebut the community property presumption for a joint tenancy residence with evidence of an oral agreement that it was separate property.  (Cal. Law Revision Com. com., 29D West's Ann. Fam. Code (1994 ed.) foll. § 2580, p. 90-91.)  "The requirement of a writing provides a reliable test by which to determine the understanding of the parties.  It seeks to prevent the abuses and unpredictability that have resulted from the oral agreement standard."  (*Id*. at p. 91.)

The Commission noted, "The presumptions also govern property initially acquired before marriage, the title to which is taken in joint form or as community property by the spouses during marriage.  The measure of the separate property contribution under Section 2640 in such a case is the value of the property at the time of its conversion to joint or community property form."  (Cal. Law Revision Com. com., 29D West's Ann. Fam. Code (1994 ed.) foll. § 2581, p. 92.)

## C. Application of Family Code Section 2851

The modification agreement stated Lafkas and Doane, as husband and wife, own one-third interest in the partnership. This is a joint form of title. According to the law above, a partnership interest is considered to be "acquired during marriage in joint form" for the purposes of section 2851 whether it is initially acquired in joint form or initially acquired as separate property but placed in joint form during marriage. In this case, the admission of a new partner caused the dissolution of the partnership under former Corporations Code section 15031, subdivision (7), unless otherwise provided in writing signed by all of the partners before admission. By operation of law, therefore, the modification agreement dissolved the existing partnership and created a new partnership. The new partnership interest was taken in joint form, and therefore is community property at dissolution under section 2851, unless section 852 requires otherwise.

## D. Enactment of Transmutation Requirements

In 1984, the Legislature adopted the transmutation statutes of former Civil Code sections 5110.710 through 5110.740, now Family Code sections 850 through 853. (*Estate of MacDonald* (1990) 51 Cal.3d 262, 267-268.) The Commission reported that existing law made it "quite easy for spouses to transmute both real and personal property; a transmutation can be found based on oral statements or implications from the conduct of the spouses." (Recommendation Relating to Marital Property Presumptions and Transmutations, 17 Cal. Law Revision Com. Rep. (1984) (Commission report) p. 213, fn. omitted.) The rule allowing easy transformations reflected the convenience and informality of interspousal transfers, but "generated extensive litigation in dissolution proceedings. It encourages a spouse, after the marriage has ended, to transform a passing comment into an 'agreement' or even to commit perjury by manufacturing an oral or implied transmutation." (*Id.* at p. 214.)

16

To solve the problem of easily manipulated and unreliable evidence in transmutation cases, the Legislature adopted former Civil Code section 5110.730, now codified as Family Code section 852. (*Estate of MacDonald*, *supra*, 51 Cal.3d at pp. 268-269; *Valli*, *supra*, 58 Cal.4th at p. 1401.) A married person may transmute the character of property from separate to community or from community to separate by agreement or transfer, with or without consideration. (§ 850.) However, the transmutation must meet statutory requirements to be valid. (*In re Marriage of Haines* (1995) 33 Cal.App.4th 277, 293.) "A transmutation of real or personal property is not valid unless made in writing by an express declaration that is made, joined in, consented to, or accepted by the spouse whose interest in the property is adversely affected." (§ 852, subd. (a).)

The Commission's report states that the statute "imposes formalities on interspousal transmutations for the purpose of increasing certainty in the determination whether a transmutation has in fact occurred." (Commission report, *supra*, at pp. 224-225.) The transmutation statutes overruled case law inconsistent with the new requirements, including the *Lucas* court's holding that husband made a gift of community property by allowing title to be taken in wife's name alone. (*Valli*, *supra*, 58 Cal.4th at p. 1406, fn. 2.)[5]

---

[5] The Commission also recommended the Legislature enact a new Civil Code section 5110.630 as follows: "Except as otherwise provided by statute, the form of title to property acquired by a married person during marriage does not create a presumption or inference as to the character of the property, and is not in itself evidence sufficient to rebut the presumptions established by this article." (Commission report, *supra*, at p. 221.) Under the proposed section, the form of title may be evidence of an agreement, but would not be sufficient to rebut the community property presumption for property acquired during marriage. (*Ibid.*) The Commission noted that exceptions might exist: "Section 4800.1, for example, creates a presumption for the purpose of division of property at dissolution of marriage applicable to property acquired in joint tenancy form." (*Id.* at p. 222.)

"In 1984, legislation was introduced to enact section 5110.630 as proposed by the Law Revision Commission, along with other recommended statutes regarding transmutation of marital property. (Assem. Bill No. 2274 (1983–1984 Reg. Sess.) § 6.) The Estate Planning, Trust and Probate Law Section of the State Bar of California opposed the proposed elimination of the form of title presumption, stating 'the form of

The transmutation statutes apply to property transactions between spouses, as well as property purchased from third parties. (*Valli*, *supra*, 58 Cal.4th at pp. 1405-1406.) An "express declaration" is a writing signed by the adversely affected spouse "which expressly states that the characterization or ownership of the property is being changed." (*Estate of MacDonald, supra,* 51 Cal.3d at p. 272.) "An 'express declaration' does not require use of the terms 'transmutation,' 'community property,' 'separate property,' or a particular locution. [Citation.]" (*In re Marriage of Starkman, supra,* 129 Cal.App.4th at p. 664.) "Though no particular terminology is required [citation], the writing must reflect a transmutation on its face, and must eliminate the need to consider other evidence in divining this intent. [Citation.]" (*In re Marriage of Benson* (2005) 36 Cal.4th 1096, 1106-1107.) "The express declaration must unambiguously indicate a change in character or ownership of property. [Citation.] A party does not 'slip into a transmutation by accident.' [Citation.]" (*In re Marriage of Starkman, supra,* at p. 664.)

Courts have adhered closely to these requirements and declined to find a valid transmutation without a clear understanding in writing that the document changes the character or ownership of specific property. (*In re Marriage of Starkman*, *supra*, 129 Cal.App.4th at pp. 663-665 [trust language stating any property transferred to the trust was community property unless identified as separate property did not unambiguously establish spouse was effecting a change of ownership of separate property]; *In re*

title should create a presumption as to the character of the property. When property, for example, is taken in the name of a wife as her sole and separate property, it is the intent for the parties that it be so treated.' (Estate Planning, Trust and Probate Law Section, State Bar of Cal., letter to Assemblyman Alister McAlister, Feb. 28, 1984, p. 4.) Citing this opposition and other comments to the proposed statute, the Law Revision Commission requested that the bill be amended to omit section 5110.630. (Cal. Law Revision Com., letter to Assemblyman Alister McAlister, Mar. 22, 1984.)" (*In re Marriage of Brooks* (2008) 169 Cal.App.4th 176, 189, overruled on another issue in *Valli*, *supra*, 58 Cal.4th at p. 1405.) The legislation was amended as requested and the remaining transmutation statutes enacted. (*Ibid*.)

*Marriage of Barneson* (1999) 69 Cal.App.4th 583, 589-590 [written instructions to "transfer" stock to spouse's name, and form stating the undersigned hereby sells, assigns and transfers unspecified shares of stock to spouse, did not expressly state the characterization or ownership of the property was being changed]; *Estate of Bibb* (2001) 87 Cal.App.4th 461, 468-470 [registration of separate property automobile in the name of husband "or" wife was not a valid transmutation, because DMV printout was not signed by adversely affected spouse and did not contain clear and unambiguous expression of intent to change character, but deed granting property from husband to husband and wife as joint tenants was a valid transmutation, because it was signed by the adversely affected spouse and "grant" is the word historically used to transfer an interest in real property]; *In re Marriage of Leni* (2006) 144 Cal.App.4th 1087, 1096 [escrow instructions to split proceeds from sale of community property "50/50" did not satisfy transmutation requirements, because there was no express declaration that the character of the property was being changed]; compare *In re Marriage of Holtemann* (2008) 166 Cal.App.4th 1166, 1172-1173 ["Transmutation Agreement" stating character of listed property was transmuted from husband's separate property to community property of both spouses was a valid transmutation]; *In re Marriage of Lund* (2009) 174 Cal.App.4th 40, 51-52 [agreement stating husband's separate property "is hereby converted to community property of Husband and Wife" was a valid transmutation].)

### E.  Application of Family Code Section 852

The modification agreement provides Lafkas and Doane with an undivided one-third interest as husband and wife.  The one-third interest in the new partnership is traceable directly from Lafkas's one-third interest in the prior partnership.  The parties did not provide any additional consideration to the partnership.  The addition of Doane to the partnership did not reduce the ownership interest of any partner other than Lafkas.  The clear intent of the modification agreement was to add Doane as a co-owner of the interest formerly held by Lafkas as his separate property.

The modification agreement does not meet the requirements for a valid transmutation of Lafkas's separate property to community property under section 852, because it does not contain any express declaration that the characterization or ownership of the property is being changed. The modification signed by Lafkas simply adds Doane's name as owner of an undivided one-third interest as husband and wife. A valid transmutation requires more than simply naming one or both spouses as the owner in a title document. (*Valli*, *supra*, 58 Cal.4th at pp. 1399, 1406.) Additional language is required to show that the adversely affected party understands the character of his or her property is being changed. The language of the modification agreement is not sufficient to meet the requirements of an express declaration under section 852.

We do not look to extrinsic evidence to determine whether a writing meets the transmutation requirements. However, our determination that the modification agreement does not contain an express declaration changing the character of the property is reflected in the trial court's finding that there was no intent to transmute Lafkas's separate property interest in profits from property acquired prior to the date of the modification agreement.

## F. Priority of Family Code Section 852

We conclude that when the provisions of sections 2851 and 852 conflict, the transmutation requirements of section 852 must be met before the joint title presumption of section 2851 applies.

"It is a fundamental rule of statutory construction that a court 'should ascertain the intent of the Legislature so as to effectuate the purpose of the law.' [Citation.] In determining such intent '[t]he court turns first to the words themselves for the answer.' [Citation.]" (*Estate of MacDonald*, *supra*, 51 Cal.3d at p. 268.) "'"We must select the construction that comports most closely with the apparent intent of the Legislature, with a view to promoting rather than defeating the general purpose of the statute, and avoid an interpretation that would lead to absurd consequences."' [Citation.]" (*In re Marriage of*

20

*Walrath* (1998) 17 Cal.4th 907, 918.) Canons of statutory construction may assist in determining legislative intent, including "the duty to harmonize statutes on the same subject if possible, the presumption against implied repeals, and the rule that a specific statute prevails over a general one." (*Medical Bd. of California v. Superior Court* (2001) 88 Cal.App.4th 1001, 1013, fns. omitted.)

Interpreting the statutory scheme to require compliance with the transmutation requirements, where applicable, before the joint title presumption applies is consistent with the legislative intent of the statutes. Section 852 states that a transmutation of personal property is not valid unless made in an express writing. Both statutes were enacted, at least in part, to prevent spouses from making unintentional gifts of property. Both statutes require spouses to establish their intentions in writing to prevent abuses and unpredictability. The writing requirement under section 852 is more specific than the general presumption based on the form of title under section 2851, and is more consistent with the legislative intent to require spouses to expressly acknowledge the change in character beyond simply stating a form of title. To construe section 2851 to allow the form of title to effect a transmutation at dissolution or separation would circumvent the protections of section 852 for no apparent reason.

Our construction of the statutory scheme avoids the absurd consequence of treating Smile Enterprises as separate property if Lafkas and Doane remained married but community property if they separated or the marriage was dissolved. If section 2851 were to apply under the circumstances of this case without regard to the transmutation requirements, Doane would have a community property interest *at separation or dissolution* based on joint title. But if the parties *stayed married* and Lafkas arranged for his daughter to inherit his separate property, the daughter would be entitled to the entire partnership interest while Doane would have no interest because the modification agreement was not a valid transmutation under section 852. We decline to interpret the statutory scheme in a manner resulting in different characterizations of the ownership of property based upon the fortuities of death, dissolution, or separation. We conclude

21

section 2851 applies at separation or dissolution to property that has been validly transmuted to joint title under section 852.

In this case, the modification agreement unquestionably did not satisfy the requirements of section 852 to effect a valid transmutation of Lafkas's separate property interest in Smile Enterprises. The partnership interest remained Lafkas's separate property under the new partnership agreement.

**Loan Proceeds**

Our conclusion that Lafkas owned a one-third interest in the partnership as his separate property does not fully resolve whether the community had a claim to any share of his interest. We requested additional briefing from the parties as to the character of the loan proceeds received by Smile Enterprises for the purchase of the Riverside properties.

"[T]he character of credit acquisitions during marriage is 'determined according to the intent of the lender to rely upon the separate property of the purchaser or upon a community asset. [Citations.]' [Citation.]" (*In re Marriage of Grinius* (1985) 166 Cal.App.3d 1179, 1186.) The proceeds of a loan made on a spouse's personal credit are considered community property. (*Bank of California v. Connolly* (1973) 36 Cal.App.3d 350, 375.) "Ordinarily funds borrowed by hypothecation of a spouse's separate property are also separate property. [Citation.]" (*Ibid.*) "Loan proceeds acquired during marriage are presumptively community property; however, this presumption may be overcome by showing the lender intended to rely solely upon a spouse's separate property and did in fact do so. Without satisfactory evidence of the lender's intent, the general presumption prevails." (*In re Marriage of Grinius*, *supra*, at p. 1187.)

A spouse's signature on a note and mortgage does not compel finding that the lender relied on the credit of the community. (*Ford v. Ford* (1969) 276 Cal.App.2d 9, 13.) The *Ford* court noted, "The state of mind of the seller (or, as in this case, the lender) is of course a question of fact. The circumstance that in this case the lender required respondent's signature on the note and mortgage raises an inference that if she had not

22

been willing to execute the documents credit would not have been extended. That inference is not unreasonable even though the substantial value of the two farms made subject to the mortgage, as compared with the modest community estate and earning capacity, might indicate that the security given on appellant's separate property was the more weighty factor in inducing the Federal Land Bank to grant a loan. Nevertheless, it might seem that these considerations all properly fell within the province of the trial court in determining the question of fact which we have identified." (*Id.* at p. 14.)

In this case, the partnership borrowed $404,000 to purchase the Riverside properties. The loans were taken out in the name of the partnership and secured by partnership property, which by statute is not community property. The parties anticipated the income from the Riverside properties would be sufficient to pay its expenses. Smile Enterprises had funds in bank accounts to cover any shortfall, and the partnership owned other properties. Smile Enterprises' net worth at the time of the purchase was approximately $500,000 or $600,000, which includes $108,646.16 used to purchase the Riverside properties. As a result, the loans were secured by the value of partnership properties and Smile Enterprises had a minimum of $400,000 in additional assets available to repay the loans. The partners signed the documents for the purchase in their capacities as general partners on behalf of Smile Enterprises, not as individuals. Lafkas had other separate property assets available to satisfy creditors, and Lafkas and Doane did not own any community real property. In light of the fact that Smile Enterprises had sufficient assets to repay the loans twice over, a trier of fact could reasonably conclude the lender intended to rely solely on partnership property to satisfy the debt, rather than the individuals' salaries and personal credit.

On the other hand, a trier of fact may find a portion of the loan proceeds constituted community property if the lender intended to look to the partners' community property income or personal credit. It is true that the general partners assumed personal liability for payment of the debt and the lender required Doane's participation in the transaction. If a portion of the proceeds invested in the partnership were received based

23

on community credit, a proportionate share of Lafkas's partnership interest must be allocated to the community.

**Attorney Fees**

In light of our conclusion that the judgment must be reversed as to the characterization and division of the Smile Enterprises partnership, the award of attorney fees to Doane must be reversed and remanded for a new determination.

## DISPOSITION

The portion of the judgment dividing the interest in Smile Enterprises and awarding attorney fees is reversed for further proceedings in accordance with this opinion. In all other respects, the judgment is affirmed. Appellant John Lafkas is awarded his costs on appeal.

KRIEGLER, J.

We concur:

TURNER, P. J.

MOSK, J.