Filed 12/16/25  Lin v. Lin CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| JULIE LIN,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>JEFFREY LIN,<br><br>    Defendant and Appellant. | B340097<br><br>(Los Angeles County<br>Super. Ct. No. 20STFL08152)<br><br>ORDER MODIFYING OPINION<br>AND DENYING REHEARING<br><br>NO CHANGE IN JUDGMENT |

THE COURT:

It is ordered that the opinion filed herein on November 20, 2025, be modified as follows:

1. On page 11, footnote 11 is deleted in its entirety.  This will require renumbering of all subsequent footnotes.

There is no change in the judgment.

Respondent's petition for rehearing is denied.

NOT TO BE PUBLISHED

_____

M. KIM, J.          BENDIX, Acting P. J.          WEINGART, J.

Filed 11/20/25  Lin v. Lin CA2/1 (unmodified opinion)

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| JULIE LIN, | B340097 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. 20STFL08152) |
| v. | |
| JEFFREY LIN, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Anne Kiley, Judge.  Reversed and remanded with directions.

Law Office of Peter Gold and Peter Gold for Defendant and Appellant.

Cuneo & Verano, J. Nicholas Cuneo, and Janina A. Verano for Plaintiff and Respondent.

_____

In 2024, appellant Jeffrey Lin and respondent Julie Lin settled their divorce.[1]  Their attorneys recited the terms of the settlement agreement in open court, agreeing to later reduce the settlement to a stipulated judgment the court could sign.  Two of the terms the parties agreed on were: (1) "as to property allocation and confirmation, the parties agree that they can both be confirmed all property and assets debts contained on Exhibit 240 [*sic*]"; and (2) "any accounts, retirement accounts, that have been allocated to the parties in the balance sheet that need to be QDRO[ed] will be QDRO[ed]."[2]  The parties also asked the trial court to retain jurisdiction to enforce the settlement.

At issue in this appeal is how the settlement agreement disposed of three retirement accounts listed on Exhibit 240, each of which comprised at least some community property.  In the proceedings below, Jeffrey contended the provisions of the settlement agreement discussed above meant two of the retirement accounts—those in his name—were his to keep, with no distribution to Julie, and one of the accounts—in Julie's name—was hers to keep, with no distribution to him.  Julie

---

[1] Because the parties shared a surname, we refer to them by their first names.

[2] "A QDRO is defined, in part, as a ' "domestic relations order" ' relating 'to the provision of . . . marital property rights' that creates 'the existence of an alternate [retirement plan] payee.' " (*In re Marriage of DeBenedetti & Ensberg* (2025) 110 Cal.App.5th 1035, 1039; see also 29 U.S.C. § 1056(d)(3)(B)(i) ["the term 'qualified domestic relations order' means a domestic relations order . . . [¶] . . . which creates or recognizes the existence of an alternate payee's right to, or assigns to an alternate payee the right to, receive all or a portion of the benefits payable with respect to a participant under a plan"].)

2

disagreed, arguing the provisions meant the parties would evenly divide the community property portions of each of the retirement accounts as directed by a QDRO.

The trial court concluded the parties intended to evenly divide the community property portions of the retirement accounts and entered a judgment to that effect. On appeal, Jeffrey argues the trial court erred in interpreting the parties' agreement both because the terms unambiguously directed each party to keep their own accounts, and because any ambiguity resolved in favor of such an interpretation. We agree the terms unambiguously direct each party to keep their own accounts and therefore reverse.

## FACTUAL AND PROCEDURAL BACKGROUND

### A. *The Parties' Counsel Recite Settlement Terms*

Jeffrey and Julie married in January 2003. In August 2020, Julie filed for divorce. In March 2024, the parties informed the court (Judge Lawrence P. Riff) they had reached a global settlement, the terms of which the court ordered them to place on the record.

Among other provisions, Julie's counsel stated: "[A]s to property allocation and confirmation, the parties agree that they can both be confirmed all property and assets debts contained on Exhibit 240 [*sic*] and that's -- respondent's binders, but there will be no offsets or reimbursements due related to that allocation."[3] She added: "In addition, as it relates to property, all *Watts* claims, all *Epstein* claims, all retroactive support claims and

---

[3] Hereafter, we refer to this as the "allocation provision."

3

arrearages are mutually waived. And there are no offsets or reimbursements due to either party as it relates to those issues." When Jeffrey's counsel echoed, "all reimbursements and claims against each other are waived including *Epstein*, *Watts*, retro support, everything," Julie's counsel confirmed, "Any sort of reimbursement; correct?" Jeffrey's counsel agreed.

Julie's counsel also informed the court, "any accounts, retirement accounts, that have been allocated to the parties in the balance sheet that need to be QDRO[ed] will be QDRO[ed] and that the parties will share the fees equally to do so."[4] Jeffrey's counsel responded, "That's correct." When the court asked to confirm there was "no dispute as to personal property division," Jeffrey's counsel replied, "It's all according to the balance sheet." Julie's counsel did not state there were any exceptions to that statement.[5]

In response to the court's inquiry, both Jeffrey and Julie stated they had listened carefully to their counsel's recitation of the settlement, confirmed it was an accurate representation of their agreement, and stated they had no questions of their counsel or the court.

The parties stated they intended to submit a stipulated judgment for the court to sign and asked the court to retain

---

[4] Hereafter, we refer to this as the "QDRO provision."

[5] In discussing what percentage of Jeffrey's bonus would be paid for child support and spousal support, Julie's attorney stated, "[T]he percentage of his bonus, for purposes of an Ostler-Smith calculation, is ten percent" and for spousal support, "petitioner is entitled to 17 percent." There was no discussion regarding the monetary or percentage division of any retirement accounts.

4

jurisdiction to enforce the settlement under Code of Civil Procedure section 664.6.[6]

### B. *Exhibit 240*

Exhibit 240 is a five-page document, entitled "Marriage of Lin [¶] Community / Separate Property - [¶] Known Assets/Liabilities for All Properties [¶] & Proposed Division."[7] (All caps and boldface omitted.)  The document contains two main columns—"Respondent (H)" and "Petitioner (W)"—and several sub-columns.  Of relevance to this appeal are columns for the "DESCRIPTION" of various assets, Jeffrey's proposal for how the community property portion of each asset would be distributed between him and Julie, and Julie's proposal regarding the same question.

For example, on the second page of Exhibit 240, Jeffrey valued the couple's home at $3,700,000, claimed $311,439 of that amount was his separate property, and proposed to distribute the remaining $3,388,561 of community property by giving Julie

---

[6] (Code Civ. Proc., § 664.6, subd. (a) ["If the parties to the settlement agreement or their counsel stipulate in writing or orally before the court, the court may dismiss the case as to the settling parties without prejudice and retain jurisdiction over the parties to enforce the settlement until performance in full of the terms of the settlement"].)

[7] Two versions of this document are in the appellate record, one included in Jeffrey's appendix and one in Julie's.  Julie states that, for purposes of this appeal, it does not matter which version we review.  We therefore review the version in Jeffrey's appendix.

$1,694,281 and taking the remaining $1,694,280 himself.[8]  Julie agreed with the valuation but claimed it was all community property and proposed distributing half the value to each spouse. On the same page, both parties claimed a 2019 BMW was community property.  Each spouse valued the car differently, but both agreed it should be distributed to Julie.  A 2008 BMW—also community property—was allocated to Jeffrey.

Listed under "RETIREMENT ACCOUNTS" on page 5 of Exhibit 240 are (among other accounts): "Brightsphere 401K Plan," "TCW P/S & Savings Plan," and "Charles Schwab IRA." Under the columns indicating how the parties proposed to distribute the community property portion of these assets, both Jeffrey and Julie stated the entirety of the "Brightsphere 401K Plan" and "TCW P/S & Savings Plan" would be distributed to Jeffrey, with nothing distributed to Julie, and the entirety of Charles Schwab IRA would be distributed to Julie with nothing distributed to Jeffrey.[9]  The parties also noted that a payment of $311,792 (according to Jeffrey) or $338,415 (according to Julie)

---

[8] Jeffrey also noted, under the entry for the house, that he had an "FC2640 claim" for $311,439, the amount he claimed was his separate property.  (Fam. Code, § 2640, subd. (b) ["In the division of the community estate under this division, unless a party has made a written waiver of the right to reimbursement or has signed a writing that has the effect of a waiver, the party shall be reimbursed for the party's contributions to the acquisition of property of the community property estate to the extent the party traces the contributions to a separate property source"].)

[9] In the stipulated judgment, the parties agreed the Brightsphere and TCW accounts were in Jeffrey's name, and the Charles Schwab account was in Julie's name.

6

from Jeffrey to Julie would be required to "equalize" the retirement accounts.

In an April 2024 pleading to the court regarding attorneys' fees, Julie represented that "the parties clearly agreed that Exhibit 240 would serve as a kind of inventory of all assets and debts for award/confirmation purposes only—not values."

### C. *Jeffrey and Julie Disagree on How to Interpret the Settlement Terms*

On May 21, 2024, the parties appeared before the court to report they could not agree on a stipulated judgment due to two main issues: whether there would be a "cap" on the spousal support Jeffrey would pay Julie and how to divide the parties' retirement accounts.

Jeffrey's counsel argued the parties agreed all assets and properties were to be split as stated in Exhibit 240, wherein "the retirement plans are clearly allocated in the respective columns of the parties." Specifically, Jeffrey's counsel cited the lines on Exhibit 240 that delineated the Brightsphere, TCW, and Charles Schwab accounts and pointed out both parties had allocated those accounts to the parties in whose name the accounts were held. Counsel added that changing the allocation of the retirement accounts to what Julie's counsel was advocating "would have changed the whole deal," stating "my client waived his [Family Code] 2640 [claim]. There's all different things that would fall because of this."

Regarding the QDRO provision, Jeffrey's counsel explained the parties added that language "only pursuant to discussions we had, which I believe is frequently the case -- there's an article about it -- but the retirement plans or ERISA government plans sometimes require QDRO's either to confirm a retirement plan to

7

the employee spouse so that they're insulated from the unemployee [*sic*] spouse coming back after them." He added, "it was no harm, no foul to include that provision."

Julie's counsel countered that, had the parties intended for each spouse to keep the contents of the retirement accounts in their name, there would be no need to have any accounts submitted to an expert to prepare a QDRO, and that parties "only hire a QDRO attorney when you're dividing the separate and community elements in a retirement plan." In responding to the court's question on what she meant when she had said the accounts were "allocated to the parties," Julie's counsel responded, "By allocated what I think I was trying to say is are they community or are they separate. What is the characterization? I think that's what I meant. And we agreed on that characterization." And that by saying certain accounts needed to be "QDRO[ed]," she meant the portion of the retirement accounts that were community property would be "divided equally" between the parties.

The court held that "based on the entirety of the record, the petitioner [Julie] has the better of the argument." The court found that when Julie's attorney had stated all property, assets, and debts contained in Exhibit 240 would be allocated and confirmed, that was "a general and broad statement of property allocation and confirmation." But when the attorney stated any retirement accounts allocated to the parties in the balance sheet that needed to be subject to a QDRO would be, those were "more specific words concerning the retirement accounts" and those were the words the court "think[s] need to be enforced, not the more general language." The court found significant that, when discussing the accounts to be subject to a QDRO, Julie's counsel

8

had discussed retirement accounts that were "allocated to the parties," but not accounts "allocated and confirmed to the parties," and opined the use of the word "allocated" was "imprecise." The court concluded the parties had agreed that "the community interest portion of those retirement accounts need to be QDRO[e]d so that they can then be allocated, and the parties agree to split the cost of the QDRO."

### D. *The Court Enters Judgment*

In June 2024, the court entered a stipulated judgment.[10] Among other terms, the judgment specified "the community interests in the following retirement accounts shall be subject to equal division pursuant to a QDRO(s): The Brightsphere 401k plan in Respondent's name; the TCW 401(k) in Respondent's name; and the Charles Schwab IRA Plan in Petitioner's name. In dividing the aforementioned plans, each party shall be assigned her/his respective separate property interest and one-half community interest in such retirement accounts." The judgment also provided that "Notwithstanding anything to the contrary set forth in this Stipulated Judgment, Respondent objects to this Court's rulings made at the hearing in this case on May 21, 2024, and inclusion of the provisions set forth in this section of the Stipulated Judgment relating to Division of Retirement Accounts shall not be deemed to be Respondent's stipulation or consent to the division of the parties' retirement accounts as ordered by the Court on May 21, 2024, and shall not constitute a waiver of either parties' rights to challenge this Court's rulings on appeal or as otherwise permitted by law." Jeffrey timely appealed.

---

[10] The judgment was signed by Judge Anne Kiley.

9

## DISCUSSION

### A.   *The Settlement Agreement Unambiguously Awards Each Party's Retirement Accounts to That Party*

Both parties agree that "[w]hen the trial court's construction of a written agreement is challenged on appeal, . . . and no extrinsic evidence is necessary to resolve any ambiguity or uncertainty, interpretation of the contract is subject to de novo review."  (*In re Marriage of Lafkas* (2015) 237 Cal.App.4th 921, 932.)  They further agree such a situation exists here.

" 'Marital settlement agreements incorporated into a dissolution judgment are construed under the statutory rules governing the interpretations of contracts generally.' "  (*In re Marriage of Nassimi* (2016) 3 Cal.App.5th 667, 687–688.)  "The primary object of contract interpretation is to ascertain and carry out the mutual intention of the parties at the time the contract was formed, determined from the writing alone, if possible."  (*Id.* at p. 688.)  "When the language of a contract is 'clear, explicit, and unequivocal, and there is no ambiguity, the court will enforce the express language.' "  (*Ibid.*)  " 'The whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other.' [Citation.]  This means that '[c]ourts must interpret contractual language in a manner which gives force and effect to every provision' [citation], and avoid constructions which would render any of its provisions or words 'surplusage.'  [Citation.]  Put simply, '[a] contract term should not be construed to render some of its provisions meaningless or irrelevant.' "  (*Ibid.*)

Here, the transcript of the oral recitation of the settlement states: "as to property allocation and confirmation, the parties

agree that they can both be confirmed all property and assets debts contained on Exhibit 240 [*sic*]." Exhibit 240 expressly allocates the Brightsphere and TCW retirement accounts to Jeffrey and the Charles Schwab retirement account to Julie. We discern no ambiguity. The transcript reflects that the settlement agreement expressly incorporated the allocation of property and assets as reflected in Exhibit 240. Exhibit 240 itself unambiguously allocates the value of the community portion of retirement accounts to the person in whose name the account was held. In other sections of Exhibit 240, such as the sections allocating the value of the home and the vehicles, the parties demonstrated they knew how to divide community assets between Jeffrey and Julie when they so intended. Neither the orally recited settlement agreement, nor Exhibit 240 makes any mention of any agreement to divide (let alone equally divide) the community property portions of the three retirement accounts at issue.[11]

---

[11] We note also that: (a) if an equalization of retirement accounts were required, Jeffrey claimed he would need to pay Julie $311,792, and Julie estimated he would need to pay her $338,415; and (b) as part of the settlement agreement, Jeffrey waived a Family Code section 2640 claim for $311,439. Although we resolve this dispute using a plain language analysis, the near equal exchange supports the argument Jeffrey's counsel made that Jeffrey waived his Family Code section 2640 claim because each party would keep their own retirement accounts, with no equalization payment.

## B. *Julie's Arguments to the Contrary Are Unavailing*

### 1. The Provisions Are Not Inconsistent, and the QDRO Provision Is Not Meaningless

Julie argues the allocation provision was a "general" provision, and interpreting the agreement this way ignores the more "specific" QDRO provision, and when general and specific versions in an agreement are inconsistent, the specific version controls. She adds that Jeffrey's interpretation "renders the QDRO provision meaningless." We reject the premise of Julie's arguments because the provisions are not inconsistent.

The QDRO provision states that "*any* accounts, retirement accounts, that have been allocated to the parties in the balance sheet that need to be QDRO[ed] will be QDRO[ed] and that the parties will share the fees equally to do so." (Italics added.) The settlement agreement therefore provides that the retirement accounts were to be allocated as indicated in Exhibit 240, and if any account required a QDRO to effect this allocation, the parties would equally split the costs to obtain such a QDRO. The agreement did not state such an account existed. The use of the word "any" demonstrates there were no accounts known at the time that required a QDRO, and reveals the contingent nature of the provision. Had the parties agreed there was a retirement account that required a QDRO, we would expect, for example, the parties would have specifically mentioned which account(s) those were or, at a minimum, referred to "the" account(s) that required a QDRO instead of "any" accounts that required a QDRO.

Moreover, were we to interpret the agreement in the manner Julie suggests, we would be prioritizing the general statement about retirement accounts that may require a QDRO

12

over the specific allocation of the Brightsphere, TCW, and Charles Schwab accounts set forth in Exhibit 240, rendering the specific allocations in Exhibit 240 meaningless.

### 2. Jeffrey's Interpretation Does Not Ignore the Definition of QDRO

Julie also argues that mention of a QDRO necessarily means the parties intended for the other spouse to receive a portion of the retirement plan because a QDRO is an order that "clearly specif[ies] . . . [¶] The amount or percentage of the participant's benefits to be paid to each alternate payee or the manner in which such amount or percentage is to be determined" and an "alternate payee" can only be a "spouse, former spouse, child or other dependent of the participant."

As explained above, the QDRO provision provided only that, should an account require a QDRO to effect the division specified in Exhibit 240, the parties would obtain a QDRO expert to fashion such an order, and equally split the costs of doing so. Whether or not a QDRO can be used to effectuate a waiver of all benefits, we see no reason why the inclusion of the QDRO provision necessarily requires we accept Julie's argument. Even assuming Julie is correct that a QDRO necessarily means the benefits will be divided according to some percentage, here, the condition precedent of the QDRO provision—that there were "any accounts . . . that need to be QDRO[ed]"—was unmet, and thus no QDRO expert would be needed.[12]

---

[12] Moreover, Julie argues that a QDRO must "clearly specify," among other terms, "[t]he amount or percentage of the participant's benefits to be paid to each alternate payee or the manner in which such amount or percentage is to be determined." *(Fn. is continued on the next page.)*

13

### 3. Jeffrey Did Not Forfeit His Argument

Finally, Julie contends Jeffrey forfeited his argument the QDRO was conditional and likely superfluous because he failed to raise those arguments below. While it is true Jeffrey's counsel did not use the words "conditional" or "superfluous," he expressly argued the parties inserted the QDRO provision because "the retirement plans or ERISA government plans sometimes require QDRO's either to confirm a retirement plan to the employee spouse so that they're insulated from the unemployee spouse [*sic*] coming back after them" and that "it was no harm, no foul to include that provision." First, the word "any" as used by the parties here is conditional on its face, and Julie provides no authority stating Jeffrey must preserve an argument based on the plain language of the agreement where both parties agree that our review is de novo. Second, while we do not consider the substance of these statements because they go beyond the plain language of the agreement, they sufficiently preserved his argument on appeal that the QDRO provision was conditional.

### DISPOSITION

The portions of the judgment providing that the community interests of the Brightsphere, TCW, and Schwab accounts discussed above would be divided equally between the parties is reversed. On remand, the court shall enter a new judgment

---

(Bold, italics omitted.) Julie does not address why, if the parties intended to divide the retirement accounts, there was no settlement term regarding what percentage would be allocated to each party. The parties made such provisions, for example, regarding how much of Jeffrey's bonus would be paid as child and spousal support (10 percent and 17 percent, respectively).

14

providing that the entirety of the Brightsphere and TCW accounts are awarded to Jeffrey and the entirety of the Charles Schwab account is awarded to Julie.  All other portions of the judgment are affirmed.  Appellant shall recover his costs on appeal.

NOT TO BE PUBLISHED

M. KIM, J.

We concur:

BENDIX, Acting P. J.

WEINGART, J.

15