Filed 9/29/15

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re Marriage of CHERYL A. and ROY M. WALKER.<br><br>CHERYL A. WALKER,<br><br>    Respondent,<br><br>      v.<br><br>ROY M. WALKER,<br><br>    Appellant. | G050448<br><br>(Super. Ct. No. 06D008316)<br><br>O P I N I O N |

Appeal from a postjudgment order of the Superior Court of Orange County, Nathan R. Scott, Judge.  Reversed.

The Law Offices of Saylin & Swisher, Brian G. Saylin, and Lindsay L. Swisher for Appellant.

Paul W. Samarin and Guerin L. Butterworth for Respondent.

\*         \*         \*

A marriage dissolution proceeding commences, one spouse is discharged from her debts by a bankruptcy court, a community property home subject to a secured home equity loan is sold, and the proceeds (beyond the amount needed to pay the secured lender) are available for distribution to the parties. Should the proceeds be distributed equally or is one spouse entitled to a greater share because of the bankruptcy discharge? The trial court awarded Cheryl A. Walker a larger share of the proceeds ($134,089.66) than her ex-husband Roy M. Walker ($42,490.76), ruling that to do otherwise would enforce a discharged debt against Cheryl and thereby violate federal bankruptcy law.

We reverse. This case features a secured debt on an asset jointly owned by the parties, the sale of which resulted in substantial proceeds beyond the amount of secured debt. Though a secured lender's potential right to a deficiency judgment (i.e., in personam liability) can be discharged in bankruptcy, the lender's lien on real property (i.e., in rem liability) is unaffected by a discharge in bankruptcy. Here, the lien was extinguished at closing by payment of the current amount owed on the loan, a necessary condition to selling the property and thereby benefitting both Cheryl and Roy. Under state law, the parties were entitled to equal shares of the proceeds. This result is consistent with bankruptcy law.

FACTS

The parties petitioned for dissolution of marriage in 2006. Cheryl filed for bankruptcy in December 2007. Cheryl's bankruptcy schedule A listed two real properties held in cotenancy, including the family home in Westminster, California (Westminster Property).[1] The Westminster Property was valued at $400,000, with $298,009.55 listed

---

[1]     Roy's response to the petition for dissolution identified the Westminster Property as community property.

2

as the amount of secured claims.  Schedule D identified two secured claims on the Westminster Property:  (1) a first trust deed in the amount of $195,009.55, held by Washington Mutual Home Loan (Washington Mutual); and (2) a second trust deed in the amount of $103,000 held by State Farm Bank.  In April 2008, the bankruptcy court granted Cheryl a discharge from her debts under chapter 7 of the Bankruptcy Code.  (See 11 U.S.C. § 727.)

Escrow closed on the sale of the Westminster Property in April 2013.  State Farm Bank, the holder of the second trust deed, was paid $95,732.90 through escrow.[2]  After payment of the secured loans and closing costs, the sale of the Westminster Property netted $176,580.42.  The parties agreed Cheryl's counsel would hold the proceeds in a trust account because of unresolved issues.

In January 2014, Cheryl moved for an order to disburse the proceeds from the sale of the Westminster Property ($176,580.42).  Cheryl posited that the disbursement of funds should not result in equal shares of $88,290.21 (despite the parties' equal ownership interests).  As relevant to this appeal,[3] Cheryl claimed she was no longer responsible for the debt owed to State Farm Bank as a result of her discharge in bankruptcy.  Had the $95,732.90 debt to State Farm Bank not existed, the proceeds available to Cheryl and Roy out of escrow would have been $272,313.32 (not $176,580.42).[4]  Ignoring other issues raised in Cheryl's motion, each party then would

_____

[2]    The record is silent as to the sale price of the Westminster Property and the amount paid to Washington Mutual, the first trust deed holder.

[3]    Not pertinent to this appeal are:  (1) a $16,000 reimbursement to Roy for separate property contributions to the Westminster Property (Fam. Code, § 2640), and (2) an offset of $5,937.50 owed to Cheryl pursuant to a prior adjudication of issues by the court.  These adjustments, which the court accepted in its order, are not contested on appeal by either party.  We therefore ignore these adjustments in our analysis for the sake of simplicity.

[4]    Cheryl did not argue she should be excused from her share of the payment

have been entitled to $136,156.66, not $88,290.21. Thus, the $95,732.90 debt to State Farm Bank reduced Cheryl's disbursement by $47,866.45. By Cheryl's reasoning, $47,866.45 should be taken from Roy's share and given to Cheryl.[5]

In March 2014, the court held a hearing on the motion. The court requested additional briefing and took the matter under submission once the briefing was completed. In a May 2014 signed order, the court granted Cheryl's motion and disbursed the sale proceeds in accordance with her request — $134,089.66 to Cheryl and $42,490.76 to Roy. Roy unsuccessfully moved for reconsideration and for a new trial. Roy then appealed.[6]

DISCUSSION

"The trial court is generally required to 'divide the community estate of the parties equally.' [Citation.] In satisfying this mandate, 'the court must distribute both the

---

of the loan to first trust deed holder Washington Mutual. Presumably, this secured loan was still in place at the time of closing and was paid out of escrow before the sale closed.

[5]        Cheryl actually uses the number $47,861.95. It is unclear how she calculated this number, however, and we will therefore use $47,866.45 (one-half of $95,732.90).

[6]        The court's May 2014 order is appealable. (See Code Civ. Proc., § 904.1, subd. (a)(2).) A judgment of dissolution was entered September 10, 2013, which ordered the sale of the Westminster Property and reserved jurisdiction over several unresolved issues. The court's order distributing the proceeds "is appealable as a postjudgment order . . . because the appeal from the [order] 'raises issues different from those arising from the judgment itself,' and because the [order] '"affect[s] the judgment or relate[s] to it by enforcing it."'" (*In re Marriage of Cooper* (2008) 160 Cal.App.4th 574, 576, fn. 2.) Alternatively, the order is appealable as "an interlocutory order collateral to the main issue, dispositive of the rights of the parties in relation to the collateral matter, and directing payment of money or performance of an act . . . ." (*In re Marriage of Skelley* (1976) 18 Cal.3d 365, 368.)

4

assets and the obligations of the community so that the residual assets awarded to each party after the deduction of the obligations are equal.'" (*In re Marriage of Walrath* (1998) 17 Cal.4th 907, 924.) The parties apparently accept the (unstated) premise that, absent Cheryl's bankruptcy discharge, the proceeds of the sale of the Westminster Property would be distributed evenly (subject to the minor adjustments described in footnote 3).

The issue presented is whether bankruptcy law prohibits the equal distribution of the proceeds of the Westminster Property because it would, in essence, enforce State Farm Bank's debt against Cheryl after her discharge. "[A] central purpose of the [Bankruptcy] Code is to provide a procedure by which certain insolvent debtors can reorder their affairs, make peace with their creditors, and enjoy 'a new opportunity in life with a clear field for future effort, unhampered by the pressure and discouragement of preexisting debt.'" (*Grogan v. Garner* (1991) 498 U.S. 279, 286.) Does Cheryl's fresh start encompass awarding her the lion's share of the proceeds of the sale of the Westminster Property?

No. To illustrate why not, we must take an abbreviated tour through the underlying structure of a chapter 7 bankruptcy before addressing the issue at hand.

*Chapter 7 Bankruptcy*

When a "debtor" (11 U.S.C. § 101(13)) petitions for bankruptcy, she takes on several obligations. Of pertinence here, a debtor is required to file "a list of creditors" (11 U.S.C. § 521(a)(1)(A)) and "a schedule of assets and liabilities" (11 U.S.C. § 521(a)(1)(B)(i)). As explained above, Cheryl filed schedules alongside her petition, which identified her assets (including the Westminster Property) and liabilities owed to particular creditors (including State Farm Bank and Washington Mutual).

All community property is deemed to be property of the "estate," even if only one spouse files for bankruptcy. (See 11 U.S.C. § 541(a)(2).) In a chapter 7

5

bankruptcy, a trustee is tasked with collecting "property of the estate" and converting it to money to pay claims on the estate. (11 U.S.C. § 704(a)(1).)

Creditors may file proof of their claims in order to share in the pool of money that may be collected by the trustee. (11 U.S.C. § 501.) If there are any assets available to pay claims, the property of the estate must be distributed according to a prioritized list of recipients. (11 U.S.C. §§ 507, 726.) "The theme of Chapter 7, at least from the creditors' perspective, is fair and equal treatment of creditors in accordance with their relative priorities." (Ginsberg et al., Ginsberg & Martin on Bankruptcy (2015 suppl.) § 12.01, p. 12-5 (Ginsberg).)

An eligible debtor who petitions for relief under chapter 7 of the Bankruptcy Code and complies with his or her obligations is generally entitled to "a discharge." (11 U.S.C. § 727(a).) With some exceptions, "a discharge . . . discharges the debtor from all debts that arose before the date of the order for relief under this chapter. . . ." (11 U.S.C. § 727(b).) "This is true whether creditors are paid 100% of what they are owed, 50% of what they are owed, or, as is most common in a Chapter 7 case, none of what they are owed." (Ginsberg, *supra*, at § 12.01.) Among other things, a discharge "operates as an injunction against the commencement or continuation of an action . . . or an act, to collect, recover or offset any such debt as a personal liability of the debtor . . . ." (11 U.S.C. § 524(a)(2).)

*Secured Liens are Not Eliminated by a Discharge*

Here, the debt owed to State Farm Bank was secured by a deed of trust on the Westminster Property. This affected not only how the Westminster Property was treated in bankruptcy, but also the meaning of the bankruptcy discharge with regard to the State Farm Bank debt.

Obviously, the basic script presented above for a chapter 7 bankruptcy was not followed with regard to the Westminster Property. The parties maintained possession

of the Westminster Property. It was not sold by the trustee for the benefit of all creditors. Instead, it was sold by Cheryl and Roy after Cheryl's bankruptcy closed, at which time the banks (Washington Mutual and State Farm Bank) were paid in full for the debts they were owed, and the remainder was available for distribution to Cheryl and Roy. Why did the parties (and the banks) receive this preferential treatment in bankruptcy with regard to the Westminster Property?

In part, this happened because Cheryl claimed the estimated equity in the Westminster Property ($101,990.45) as exempt. (11 U.S.C. § 522(b); Code Civ. Proc., § 704.710 et seq.) "The Bankruptcy Code provides that an individual debtor in bankruptcy can retain some property or proceeds of property either because it is exempt under a substantive bankruptcy provision or because it is exempt in the debtor's home state. An exemption has been called an interest of the debtor in the property that is withdrawn from the bankruptcy estate, and placed outside the reach of creditors." (Ginsberg, *supra*, at § 6.01, p. 6-3.)

More importantly for our purposes, the remainder of the value in the Westminster Property (approximately $300,000) was subject to deeds of trust held by Washington Mutual and State Farm Bank. There was no equity beyond Cheryl's exemption and the banks' liens in the Westminster Property to provide any value to Cheryl's unsecured debtors. According to the schedules filed by Cheryl,[7] the banks' claims were entirely secured because they were $100,000 below the estimated market value of the Westminster Property. (11 U.S.C. § 506(a)(1) ["An allowed claim of a creditor secured by a lien on property in which the estate has an interest . . . is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property . . . and is an unsecured claim to the extent that the value of such creditor's interest . . . is less than the amount of such allowed claim"].) "[P]roperty that is subject

---

[7] The record does not include any indication that a bankruptcy proceeding to determine the fair market value of the Westminster Property occurred.

7

to a valid security interest or lien and in which the debtor has no equity is technically property of the estate; however, the trustee will rarely take possession or control of such property because its sale will not yield a dividend to general unsecured creditors." (Ginsberg, *supra*, at § 12.06, p. 12-82, fn. omitted; see 11 U.S.C. § 554(a) ["trustee may abandon any property of the estate . . . that is of inconsequential value and benefit to the estate"].)

What then was the effect of Cheryl's bankruptcy discharge on the State Farm Bank debt? "It is well settled that valid, perfected liens and other secured interests pass through bankruptcy unaffected. [Citation.] The majority of courts hold . . . that valid liens that have not been disallowed or avoided survive the bankruptcy discharge of the underlying debt." (*In re Cortez* (Bankr. 9th Cir.) 191 B.R. 174, 177.) "[A] bankruptcy discharge extinguishes only one mode of enforcing a claim — namely, an action against the debtor *in personam* — while leaving intact another — namely, an action against the debtor *in rem*." (*Johnson v. Home State Bank* (1991) 501 U.S. 78, 84.) Because State Farm Bank had not been paid and the Westminster Property had not been sold, its lien was still in place as against Cheryl and Roy even after the bankruptcy discharge. The only effect of the discharge on Cheryl's debt to State Farm Bank was to eliminate State Farm Bank's right to pursue Cheryl for the amount owed "as a personal liability of the debtor . . . ." (11 U.S.C. § 524(a)(2).) State Farm Bank was still entitled to utilize its lien as a means of recovering the amount it was owed.

*Cheryl's Bankruptcy Discharge Does Not Affect the Distribution of the Sale Proceeds*

Cheryl asserts that an equal division of the sale proceeds in this dissolution action would amount to collecting or offsetting her discharged debt to State Farm Bank, in contravention of the discharge she received under federal law. There is no California case precisely on point, though several discuss the effect of a bankruptcy discharge on unsecured debts in the context of family law disputes. (See *In re Marriage of Lynn*

8

(2002) 101 Cal.App.4th 120, 125-126 [unlike alimony, property settlement payments are dischargeable in bankruptcy]; *In re Marriage of Williams* (1984) 157 Cal.App.3d 1215, 1220-1224 [same; ex-husband cannot offset ex-wife's discharged obligation against his own payment obligation]; *In re Marriage of Cohen* (1980) 105 Cal.App.3d 836, 838-839; *id.* at p. 843 [requiring ex-husband to pay discharged community debts "would be contrary to the federal supremacy clause"].)[8] "Despite the obvious inequities of permitting one spouse who has assumed a share of the community property debts incident to a dissolution to subsequently discharge those debts and leave the nonbankrupt spouse liable, in apparent derogation of the otherwise equal division of community property, the practice is well recognized and not one easily circumvented by the trial courts." (*In re Marriage of Williams*, *supra*, 157 Cal.App.3d at p. 1221.)

The trial court, concluding it was bound by the cases cited above, agreed with Cheryl: "It may well be true that 'liens and other secured interests survive bankruptcy,' leaving *in rem* liability intact." But "[t]he court is not addressing whether the . . . lender could foreclose on the property, whether that lender could pursue [Roy] for any remaining deficiency, or how this court might equitably account (in ways other than property division) for any resulting liability of [Roy]. [Citation.] [¶] Here it suffices to

---

[8] Under the current version of the Bankruptcy Code (in place since 2005), debts incurred "to a spouse, former spouse, or child of the debtor . . . in the course of a divorce or separation or in connection with a separation agreement, divorce decree or other order of a court of record" are not dischargeable in bankruptcy. (Pub.L. No. 109-8 (Apr. 20, 2005) 119 Stat. 54; 11 U.S.C. § 523(a)(15)) We need not explore the vitality of the cases cited above under current bankruptcy law. The point of these cases for our purposes is that, in general, debts incurred prior to a bankruptcy petition are discharged and not enforceable by a spouse in a dissolution action by way of offset or otherwise. In this case, we have a prepetition debt owed to State Farm Bank that was discharged in bankruptcy. There is no contention by Roy that the bankruptcy court found this debt to be nondischargeable. The issue before us is the effect of the discharge, not whether the bankruptcy court should have discharged particular debts.

9

find [Roy] cannot place [Cheryl's] discharged . . . liability on her side of the property division ledger."

We disagree, and conclude that the distinction between secured and unsecured debt matters under the facts of this case. Roy and Cheryl were equally subject to State Farm Bank's lien. Before Roy and Cheryl could sell the Westminster Property and thereby access the equity in the Westminster Property, State Farm Bank's lien needed to be extinguished. Requiring Cheryl to absorb one half of the repayment of State Farm Bank is wholly consistent with the Bankruptcy Code. If Cheryl had owned the Westminster Property as her separate property, the proceeds of the sale would have been used to pay State Farm Bank to remove its lien before closing could occur. One would not say that State Farm Bank violated the bankruptcy discharge by requiring payment of the secured debt before it would release its lien. Similarly, if both Cheryl and Roy had received identical bankruptcy discharges, they would still be required to pay off State Farm Bank before closing a sale of the Westminster Property. Community property principles would generally require them to absorb this burden equally and a bankruptcy court would not hold both parties in contempt for violating each other's discharges by requesting this outcome. Federal law is not offended by charging Cheryl with her fair share of the secured debt in this case.[9]

---

[9] A contrary rule could have absurd consequences. What if the Westminster Property sold for $1 million and the balance owed to State Farm Bank was $800,000 (with no balance owed to Washington Mutual)? By Cheryl's logic, she would receive $200,000 (i.e., all of the proceeds from the sale), while Roy would owe Cheryl $300,000 (i.e., to give Cheryl her equal $500,000 share of the $1 million, unfettered by the discharged debt to State Farm Bank).

10

Cheryl's position is based on an artificial distinction between the debt owed to State Farm Bank and the lien used to secure payment of the debt, as well as a misapprehension of the true nature of a bankruptcy discharge. Cheryl classifies the payment of State Farm Bank out of escrow as payment of a debt from which she had been discharged. Cheryl's argument suggests the payment of State Farm Bank had nothing to do with the surviving lien (which, according to her, would only be pertinent in the context of foreclosure proceedings).[10]

In reality, the debt (up to the amount the security is sold for) and the lien are inseparable under both California law and bankruptcy law. "A *security interest cannot exist without an underlying obligation*, and therefore a mortgage or deed of trust is generally extinguished by either payment or sale of the property in an amount which satisfies the lien." (*Alliance Mortgage Co. v. Rothwell* (1995) 10 Cal.4th 1226, 1235, italics added.) A bankruptcy law discharge does not actually eliminate the underlying secured debt. Instead, "[t]he secured portion of the debt survives, but creditors are enjoined against enforcing it against the debtor personally." (Ginsberg, *supra*, § 11.01[B], p. 11-14, fn. 18; see *Dewsnup v. Timm* (1992) 502 U.S. 410, 416-419 [secured creditor entitled to amount of lien ultimately recoverable at foreclosure sale; bankrupt debtor cannot "strip" secured claim down to market value established during

_____

[10] This raises an issue previously hinted at in this opinion: Why is Cheryl's contention limited to State Farm Bank's secured loan? Why not claim that the debt owed to Washington Mutual was also discharged in bankruptcy, and that making the payment to Washington Mutual out of escrow was a repayment of the debt rather than an extinguishment of the lien? There is no satisfactory explanation for Cheryl's position in the record or briefs. Certainly, it is less likely that the Washington Mutual loan, in the first trust deed position, would result in a deficiency judgment. Indeed, a deficiency judgment may have been legally prohibited under California law if this loan was used as purchase money. But the premise of Cheryl's argument is that payment to State Farm Bank out of escrow is payment of the discharged debt rather than extinguishment of the surviving lien, a premise that logically applies with equal merit to Washington Mutual's secured debt.

11

bankruptcy].) It is formalistic (and wrong) to suggest that the payment of a secured debt through escrow is solely the in personam payment of a debt and not the extinguishment of a lien, whereas a foreclosure action in which the property is sold solely extinguishes the lien without paying off (at least in part) a debt.[11]

State Farm Bank's demand that it be paid out of escrow was not "an act, to collect, recover or offset" a discharged debt. (11 U.S.C. § 524(a)(2).) The payment of this debt was a necessary condition to extinguishing the lien and closing the sale. Roy's opposition to Cheryl's motion to distribute the sale proceeds unequally was not an "action" to recover or offset a discharged debt. (*Ibid.*) Roy's position instead reflected the economic reality of the parties' respective positions — they were both subject to State Farm Bank's lien and both should therefore be treated equally in a family law court's division of the ensuing sale proceeds.[12]

In sum, other than the adjustments mentioned in footnote 3, the proceeds of the sale of the Westminster Property ($176,580.42) should have been distributed evenly.

---

[11] The court was correct to observe that questions of foreclosure and deficiency judgments were not at issue here. But the inapplicability of foreclosure considerations actually supports Roy's position. California law requires secured lenders to pursue security first and severely restricts the circumstances in which a lender can obtain a deficiency judgment after exhausting its security for a debt. (See *Cadlerock Joint Venture, L.P. v. Lobel* (2012) 206 Cal.App.4th 1531, 1539-1541.) Assuming State Farm Bank had the hypothetical right to a deficiency judgment, Cheryl's bankruptcy discharge would preclude a deficiency judgment against her. Furthermore, Roy could not directly charge Cheryl with a share of the deficiency judgment through the backdoor (e.g., by offsetting his obligations to Cheryl in the dissolution action). This hypothetical scenario shows the limited value of a discharge in the context of secured debt. It does not support conveying an inequitable benefit on a discharged debtor in a case like the instant one.

[12] Equally unconvincing is the red herring that Roy should have opposed the discharge of the State Farm Bank debt in Cheryl's bankruptcy. This case turns on the legal consequences of the discharge, not whether the discharge was proper.

DISPOSITION


The postjudgment order is reversed and remanded for entry of a new order consistent with this opinion.  Roy shall recover costs incurred on appeal.


IKOLA, J.

WE CONCUR:


O'LEARY, P. J.


THOMPSON, J.

13